IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 7TH & ALLEN EQUITIES,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>Defendant. | : | CIVIL ACTION NO. 5:11-01567-JKG |

**ORDER**

**AND NOW,** this ___ day of ____________, 2012, upon consideration of Hartford Casualty Insurance Company's Motion in Limine to Exclude the Expert Testimony of Gary Sheesley, P.E. it is hereby **ORDERED** that:

1) The report of Gary Sheesely, P.E., no.: 11295, dated May 18, 2012 is hereby stricken; and

2) Mr. Sheesley, P.E. is precluded from testifying a trial concerning any of the opinions contained in that report.

3) Plaintiff is sworn representation to the Internal Revenue Service that it incurred certain losses because a "sprinkler froze and burst" estopps it from taking an inconsistent position in this matter.

BY THE COURT:

______________________________ J.

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| 7TH & ALLEN EQUITIES,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO. 5:11-01567-JKG |

**DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S NOTICE OF MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF GARY SHEESLEY, P.E.**

Defendant, Hartford Casualty Insurance Company ("Hartford"), by its undersigned counsel, hereby moves to exclude the expert testimony of Gary Sheesley, P.E. and in support thereof incorporates herein its Brief in Support thereof as if set forth at length.

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

s/Thomas S. Coleman
RICHARD D. GABLE, JR., ESQ.
rgable@butlerpappas.com
THOMAS S. COLEMAN, ESQ.
tcoleman@butlerpappas.com
1818 Market Street, Suite 2740
Philadelphia, PA 19103
Telephone: (215) 405-9191
Facsimile: (215) 405-9190
*Attorneys for Defendant, Hartford Casualty Insurance Company*

Dated: September 24, 2012

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| 7TH & ALLEN EQUITIES,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>Defendant. | : | CIVIL ACTION NO. 5:11-01567-JKG |

**DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S BRIEF IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF GARY SHEESLEY, P.E.**

Defendant, Hartford Casualty Insurance Company ("Hartford"), by its undersigned counsel, hereby presents the following Brief in Support of its Motion In Limine to Exclude The Expert Testimony of Gary Sheesley, P.E.

## I. Introduction

The background of this insurance coverage dispute is set forth at length in Hartford's Brief In Support of its Motion for Summary Judgment, which is incorporated herein by reference and attached hereto for the Court's convenience as Exhibit "A," see pp. 1-4.

On or about May 18, 2012 Plaintiff's expert engineer, Gary Sheesley, P.E. authored Report No. 11295, a copy of which is attached hereto as Exhibit "B" (hereinafter "Sheesley Report"). The Sheesley Report conclusions are set forth on pages 12-13. In sum, Mr. Sheesley opined that: 1) the sprinkler leaked due to heat activation and not (as Hartford and everyone else believed) a freeze event; and 2) that the Plaintiff protected the sprinkler from freezing. But as set forth below, those opinions

do not reliably flow from the facts developed through discovery, and indeed are undeniably contradicted by an overwhelming body of factual data, which ought to be known to Mr. Sheesley but of which no mention is made.

Accordingly, the methodology Sheesley utilized -- or more aptly the lack thereof, undermines any reliability in his conclusions.

## II. Legal Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 104 provides as follows:

> "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court..."

Fed.R.Evid. 104. And under the well-known Daubert framework::

> "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation[, *but that] relaxation of the usual requirement of firsthand knowledge.... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.*"

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (citations omitted and emphasis added).

Daubert has been extended to the testimony of engineers and other technical experts who are not scientists. See Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). And under Daubert and the Third Circuit Court of Appeals' decisions in Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000), In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717,(3d Cir. 1994) and United States v. Downing, 753 F.2d 1224 (3d Cir. 1985), there are at least eight factors which should be considered in assessing the admissibility of expert opinion testimony. These are: (1)

whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error ; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. See, e.g., Oddi, 234 F.3d at 145; Paoli, 35 F.3d at 742, n.8; Paoline v. Kilgo Trucking, Inc., Civ. A. No. 00-956, 2002 U.S. Dist. LEXIS 7569 (E.D.Pa. April 30, 2002).

Thus, while "[t]he focus of a Daubert inquiry must be solely on the principles and methodology, [and] not on the conclusions that they generate," the Court must nonetheless, consistent with Oddi, at least examine the conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Heller v. Shaw Indus. Inc., 167 F.3d 146, 153 (3d Cir.1999) (cited in Oddi, 234 F.3d at 146). And therefore, a proponent of expert testimony must demonstrate by a preponderance of the evidence that the expert opinion are reliable, i.e., that the expert's opinion is based on valid reasoning and reliable methodology. Paoline, at *4, citing Oddi, 234 F.3d at 146 and Kannankeril v. Terminix International, Inc., 128 F.3d 802, 806 (3d Cir. 1997); Rapp v. Singh, 152 F.Supp.2d 694, 699(E.D.Pa. 2001).

With respect to an alleged gap between an expert's scientific information and his conclusions, the Daubert analysis is largely restricted to the expert's methodology, and not to the conclusions. Oddi, 234 F.3d at 146. Nonetheless, "conclusions and methodology are not entirely distinct from one another." General Elec. Co. v. Joiner,

522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Heller v. Shaw Indus. Inc., 167 F.3d 146, 153 (3d Cir.1999). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." Joiner at 146, 118 S.Ct. 512; see also In re TMI Litigation, 193 F.3d 613, 682-83 (3d Cir.1999), opinion amended by 199 F.3d 158 (3d Cir.), cert. denied sub nom. General Public Utilities Corp. v. Abrams, 530 U.S. 1225, 120 S.Ct. 2238, 147 L.Ed.2d 266 (2000) and Dolan v. General Public Utilities Corp., 530 U.S. 1225, 120 S.Ct. 2238, 147 L.Ed.2d 266, (2000).

## III. The Sheesley Report Conclusions Do Not Reliably Flow From the Known Facts, And Therefore, Are Not Reliable

Mr. Sheesley stated the following six (6) conclusions:

- The leak that occurred on March 4th was not caused by freezing.

- Exposure to excessive heat was the probable cause of the incident sprinkler head activation and leak.

- Under foreseeable circumstances, heat from the occupied 1st floor of the incident building, and heat from exposed hot air ductwork on the 2nd and 3rd floors, was sufficient to prevent pipes from freezing.

- It would be expected that the coldest area of the incident 3rd floor space would be at or near the double hung windows on the worth wall.

- A sprinkler head damaged by freezing would be expected to start to leak when the ambient temperature increased sufficiently to permit the frozen head to thaw, not at 1:30AM when the outside temperature was at, or near, its low for the day.

- The Landlord of incident building heated the building sufficiently to prevent the 2nd and 3rd floor water piping from freezing under foreseeable circumstances.

Those conclusions are logically grouped into two substantive categories: 1) causation (bullet points 1, 2, 4, and 5, which address Sheeley's heat activation theory); and 2) protective measures (bullet points 3 and 6). But because these conclusions do not "reliably flow" from the known facts, an unbridgeable gap exists between the facts/data and the opinions proffered as discussed below.

i. The Sheesley Report Fails to Consider The Overwhelming Factual Data Indicating that a Freeze Event Caused the Leak

Simply stated, every technician Plaintiff hired to investigate the sprinkler leak (and every other person that went up to the 3rd floor of the building that day) reasonably deduced (in either their professional or lay capacities) that the sprinkler had burst due to freezing. The two primary (and obvious) facts relied on by those various individuals to conclude the sprinkler head froze were: 1) that it was extremely cold outside *and* on the unheated third floor that day; and 2) there was an open window in close proximity to the burst sprinkler, which was allowing frigid air to flow into the building.

In that regard, the most poignant factual testimony that Mr. Sheesley seemingly ignores comes from Mr. Addis, i.e., the Simplex Grinnell technician that actually replaced the broken sprinkler head. Mr. Addis expressly testified that the sprinkler had burst due to freezing, and moreover, that a window in close proximity to the burst head was open[1] and that he had found ice on the interior of the building in the vicinity of the burst sprinkler. Exhibit "C," p. 29 lns. 3-23. Mr. Addis also testified there was no

[1] Mr. Addis testified he had seen hundreds of pipes bust from freezing in his lengthy career as both plumber and sprinkler technician.

evidence whatsoever of a heat activation. Id. at p. 31 lns. 4-18. Yet Mr. Sheesley makes no mention of Mr. Addis' testimony. Despite that explicit testimony, Sheesley argues there is no evidence of an open window and points to the depositions of Mr. Fillman and Mr. Ellis, who only state they could not recall whether the window was open. He ignores the fact that both of those witnesses contemporaneously told Hartford – and the Plaintiff's property manager – there was an open or broken window on the third floor of the building that day.

The second most glaring oversight Sheesley made was to ignore the documentation (invoices and field reports) submitted by the various fire suppression and plumbing contractors that Plaintiff hired to fix and inspect the sprinkler system (Kistler O'Brien, Simplex Grinnell and Daryl Lapp), which uniformly indicated that a freeze event occurred. See Exhibit "D."[2] Likewise, he ignored the related witness testimony which, in various degrees of certainty, confirmed that the third floor was "very cold," "bitter cold," "frigid" that day and that the suspected cause of the leak was freezing. Exhibit "E" Deposition testimony of Rite Aid's District Manager Mr. Fillman at p. 62-63 lns. 19-24 and 1 ("Kistler O'Brien told him that the sprinkler had 'frozen and shattered'") and the deposition testimony of Kevin Fry at Exhibit " G" p. 69 lns. 12-17 ("It was bitter cold... it felt just as cold inside as it was outside").

Finally, and most egregiously Sheesley ignored Plaintiff's own internal documentation and post-sprinkler leak conduct, which unequivocally confirmed that it too had concluded that the sprinkler had burst due to freezing inasmuch as Plaintiff immediately analyzed various options concerning how to keep the sprinkler system from

---

[2] Kistler O'Brien was the company that repeatedly and expressly warned Plaintiff that the lack of heat in this building posed a serious risk of freezing to the sprinkler system and Simplex Grinnell and is also fire suppression system service contractors and Daryl Lapp is a plumber.

freezing-up again. Laura Hart notes attached as Exhibit "F," Bates 0879-0880, "There are going to be three options going forward, either *get heat to the vacant space/pipes*, convert to a dry system (expensive), or try to get those floors grandfathered, and capped off and only have sprinkler system on the first floor." (Emphasis added.) Sheesley offer no discussion of that undeniably relevant and highly probative fact.[3]

Thus, Mr. Sheesley's methodological flaws included failing to review and/or consider factual information flagrantly contrary to his opinion, including: 1) the Addis testimony; 2) the various sprinkler contractor invoices and field reports, and most tellingly 3) Plaintiff's own post-incident conduct. Such a deficient and/or cursory review of the factual record indicates, inter alia, that his methodology was flawed, rendering his report wholly unreliable.

ii. The Sheesley Report Concedes that the Sprinkler Head's Location Was Conducive to Freezing

The Sheesley Report also admits, as it must, that the burst sprinkler head was located in an area on the unheated third floor conducive to freezing. In particular, the report concedes:

> [the burst sprinkler head] was adjacent an outside wall which incorporated numerous double hung windows. Heat lost through windows, drafts around those windows and heat lost through the outside wall would cause that location to be colder than the interior areas of the 3rd floor space. *A freezing event would be expected to initiate in the vicinity of the outside wall and windows rather than in the building interior.*

Sheesley Report p. 10 (emphasis added).

[3] The record is replete with other post-incident references by Plaintiff regarding how to protect the system from freezing in the future; but the point has been made.

Nonetheless, the Sheesley Report asserts that, in this instance, the sprinkler did not freeze because:

> leaks typically do not occur immediately when pipes freeze because ice acts as a plug and prevents liquid from reaching the damaged area. Freezing leaks typically start after the temperature increases sufficiently to thaw, or partially thaw, the frozen piping""

Sheesley Rpt. P. 9.

The Sheesley Report cites no facts, let alone any publication, treatise or other authority describing the remote-freeze phenomenon. Moreover, no testing or other replicable analysis was done by Sheesley on this issue indicating that that was, or was not, what happened here. Accordingly, his contention in that regard is pure conjecture.

The Sheesley Report then devotes significant attention to explaining why, in his opinion, a remote-freeze event was "improbable," see Sheesley Rpt. P. 10.[4] But he once again failed to either review or consider critical, on-point factual evidence on that issue. In particular, the Report states "the circumstances of the subject leak were not consistent with a remote freezing event [because] there were no reports of other leaks." That statement is simply incorrect.

To the contrary, on the day of the event Plaintiff's fire suppression system contractor, Apex, reported to Plaintiff's property manager that even after replacing the ruptured sprinkler head the system would not hold pressure, unequivocally indicating that the system was leaking somewhere else. See Exhibit "F" p. 0879 (in Plaintiff's own words: "Apex could not get air pressure, so something is wide open"). Additionally, corroborating evidence of an additional leak(s) is found in the invoice submitted by

---

[4] A remote freeze event describes the condition of a freeze occurring elsewhere in the system, i.e., not at the point of discharge; and such an event would explain-away Sheeley's ice plug argument.

Simplex Grinnel, which indicated that the system "was left offline until further repairs of the building are complete". See Exhibit "D".

Those documents come directly from Plaintiff's files, yet the Sheesley Report makes no reference to those facts, begging the question of whether Mr. Sheesley knew of those facts and volitionally ignored them, or was simply unaware of such obviously contradictory evidence. But either way, his methodological failure to acknowledge, let alone consider or investigate further such obviously competing factual data undermines another basic premise in his report.

iii. Sheesley's Heat Activation Theory Is Unsupported by Any Known Facts

Mr. Sheesley asserts that the sprinkler discharged due to heat activation, and cites to three alleged facts in support of that theory. First, he notes the sprinkler's fusible link is missing after the discharge; second, he claims no observable damage to the sprinkler head; and third, he claims a Kisler O'Brien representative believed the sprinkler discharged due to heat activation. We address these contentions in *seriatim*.

While it is true that the sprinkler's fusible link was missing after the discharge and the head evidenced no observable contortions, according to Mr. Addis a missing fusible link can be caused by a variety of causes and is of no diagnostic help in determining what triggered the discharge. Exhibit "C," p. 30 lns. 6-21. Further, and also according to Mr. Addis no contortions of the head would be apparent in a freeze event. Id. But as noted, Mr. Sheesley apparently never interviewed Mr. Addis nor reviewed his deposition testimony, as evidenced by the lack of any reference thereto (and presumably the fact that the Sheesley Report was dated approximately two months *before* the Addis deposition took place).

Mr. Sheesley then notes "Hartford documents stated that Alex Sierra of Kistler O'Brien commented that the incident sprinkler head had an appearance consistent with having been activated by heat and that the head had activated in an atypical manner for a freezing event." Sheesley Rpt. P. 10-11. Despite what would appear to be, if true, critically helpful evidence for the Plaintiff, Mr. Sheesley fails to identify the particular document from which he found such a comment (the existence of which remains unconfirmed by Hartford).[5]

On the other hand, the Kistler O'Brien witness that Hartford deposed testified that when he responded to the building later that day as the "on-call technician" he concluded the sprinkler had frozen and broke. Exhibit "G," pp. 70-71. Accordingly, Mr. Sheesley's unsubstantiated, alleged double-hearsay "comment" cannot form a reasonable basis upon which he can be permitted to rely in forming such a critical opinion, and especially so in light of the overwhelming facts to the contrary.

iv. The Sheesley Report Conclusions Regarding Adequate Heating for the 3rd Floor Lack A Factual Foundation

A close reading of the Sheesley Report reveals that the only "facts" relied upon by him to conclude the 3rd floor was adequately heated are: 1) that there had been other, colder days with no reported frozen pipes, and 2) the existence of heat on the 1st floor and the allegedly exposed heat ducts on the third floor. Hartford concedes that there had been colder days than the day of the incident; but it knows of at least one other suspected freeze-related pipe burst at the building. See Hartford's Motion for Summary Judgment Exhibit "K." Further, no testable or reproducible calculations

---

[5] Surprisingly, during the depositions of the two Hartford employees Plaintiff neglected to ask either about any such pertinent comment; nor did Plaintiff depose Kistler O'Brien's Mr. Sierra (any one of those steps would have easily clarified the parameters of any such a comment).

regarding the quantum of heat provided to the first floor were done by Mr. Sheesley. Compare with Exhibit "H," which is Plaintiff's partner's prior attempt at doing just that, before he divorced himself from this action. Further, his conclusion that the sprinkler system was protected from freezing is expressly contradicted by the substantial evidence Hartford referenced in its Motion for Summary Judgment at § V.A. concerning Plaintiff's advance knowledge that the system was not protected from freezing, and the fact that Plaintiff represented to the IRS that it incurred certain losses due to "a sprinkler head freezing and bursting." Attached as Exhibit "I" is a copy of Plaintiff's tax returns. See CHRONER 0052.[6] But yet again, the Sheesley Report makes absolutely no reference to any of that factual information. Finally, upon information and belief Mr. Sheesley's training, education, and/or expertise do not qualify him to testify about property management.[7]

## V. Conclusion

The methodological flaws in Mr. Sheesley's investigation and report are rampant. For example, Mr. Sheesley never inspected the broken sprinkler head; never spoke to the contractor that fixed the broken sprinkler head; failed to review documents from Plaintiff's own file that indicted the sprinkler head broke due to freezing and that the system may have suffered more than one break; and failed to consider or address why Plaintiff was examining how to protect the system from freezing in the future, if the system had not, in fact, froze.

Instead, Mr. Sheesley opines that the sprinkler activated due to an unspecified heat source and asserts various other self-serving and unsubstantiated theories (yet

[6] Plaintiff cannot now take a position different that that sworn to the IRS.

[7] For example, he makes no mention of the various building and fire code standards that mandate sprinklered buildings be maintained at a minimum of 40°F.

admits he would expect a freeze to occur at the exact location in the building where the leak occurred). Accordingly, it is undeniable that Mr. Sheesley's investigation was methodologically deficient, his conclusions not based on the known facts, and his testimony, therefore, wholly unreliable and likely to cause confusion to the jury and unfair prejudice to Hartford on two "ultimate issues" in dispute in this case.

**WHEREFORE**, Hartford respectfully requests that Mr. Sheesley be precluded from testifying at trial and that it be granted any further relief the Court considers just and appropriate.

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

s/Thomas S. Coleman
RICHARD D.GABLE, JR., ESQ.
rgable@butlerpappas.com
THOMAS S. COLEMAN, ESQ.
tcoleman@butlerpappas.com
1818 Market Street, Suite 2740
Philadelphia, PA 19103
Telephone: (215) 405-9191
Facsimile: (215) 405-9190
*Attorneys for Defendant, Hartford Casualty Insurance Company*

Dated: September 24, 2012

**CERTIFICATE OF SERVICE**

I, Thomas S. Coleman, hereby certify that, on this 24th day of September, 2012 a true and correct copy of Defendant's Motion to Exclude the Expert Testimony of Gary Sheesley, P.E. and Memorandum of Law in Support thereof has been served on the following counsel of record via the Court's Electronic filing system:

Mark S. Kancher, Esquire
The Kancher Law Firm, LLC
Grove Professional Center
100 Grove Street
Haddonfield, NJ 08033

Mark S. Haltzman, Esq.
Silverang & Donohoe, LLC
595 East Lancaster Avenue, Ste. 203
St. Davids, PA 19087

*Attorneys for the Plaintiff*

BUTLER PAPPAS WEIHMULLER
KATZ & CRAIG, LLP

By: s/Thomas Coleman
Thomas S. Coleman, Esquire
1818 Market Street
Suite 2740
Philadelphia, PA 19103
(215) 405-9191
*Attorneys for Defendant,*
*Hartford Casualty Insurance Company*