Page 42

1    above, we will reduce the amount we would otherwise
2    pay for the physical loss of physical damage by 15
3    percent."
4    Q.  I'm sorry, I want to reach up here.  I meant
5    the -- you're right, all right.  Sorry, it's 1B, my
6    bad.  If you could --
7        A.  Just B?
8    Q.  Just B, please.
9        A.  "Sprinkler leakage, unless you had
10   protected the system against freezing."
11   Q.  Okay.  Sir, I'm going to just ask you again the
12   same question, you hadn't read that before?
13       A.  With my counsel.
14   Q.  Other than with counsel?
15       A.  I don't remember reading it before other
16   than with counsel.
17   Q.  And sir, what steps did 7th and Allen take to
18   protect the sprinkler system, its sprinkler system
19   from freezing prior to March 4th of 2009?
20       A.  We made sure there was heat in the area
21   where the sprinkler system was -- well, in the
22   building where the sprinkler system was.
23   Q.  And how did you make sure there was heat in the
24   building?

Page 43

1        A.  We went there.
2    Q.  When you say you went there, what do you mean?
3        A.  Well, I was in the building numerous
4    times, property managers were in the building
5    numerous times.
6    Q.  Well, give me again, same question, the last
7    time you were in the building before March of 2009?
8        A.  I was probably personally in the building
9    within a year before.  In addition, the property
10   manager Brian Hannin was in the building.
11   Q.  How about before that?
12       A.  I can't tell you exactly what the dates
13   were.  I mean, I was in the building hundreds of
14   times, but I can't remember exactly what the dates
15   were.
16   Q.  All right.  I'm just trying to figure out --
17       A.  But in addition to me, the property
18   managers were in the building.
19   Q.  Okay.  Laura Hart testified she never saw the
20   building, so before Laura Hart was Brian Hannin?
21       A.  Uh-huh.  She just took over when the loss
22   happened.
23   Q.  How often, if you know, was Brian Hannin in the
24   building?

Page 44

1        A.  Frequently.
2    Q.  Give me -- a better question, weekly, monthly,
3    bi-annually, give me some idea?
4        A.  I mean, when he was in it he was probably
5    in it for a series of days and maybe not in it for a
6    while.  I mean, we were in the building.  I mean,
7    one of us was in the building.  I was in the
8    building a lot of times.
9    Q.  What kind of events caused Brian Hannin to go
10   to the building?
11       A.  Well, one of the things that happened
12   frequently was that the alarm system would go off.
13   Sometimes they went off -- every time I imagine they
14   went off improperly, they went off improperly.  But
15   every time an alarm system went off someone had to
16   go there and frequently went off in the middle of
17   the night.
18   Q.  How about other than alarms, any other reason?
19       A.  Yeah.  We had tenants we were showing the
20   property to.  Had calls from the drugstores
21   periodically that something was going on.  They had
22   a loading area that they had to keep clear.  I mean,
23   we had various things happen up there.
24   Q.  Did you have -- did you have a real estate

Page 45

1    broker or agent you were using to show the property?
2        A.  No, we do that ourself.
3    Q.  Okay.
4        A.  We showed the property ourself.
5    Q.  Okay.  As far as records of inquiries into
6    leasing the property, would those be in the files of
7    Professional Property Management?
8        A.  I don't imagine there are old records of
9    people that we attempted to lease the property to
10   that we didn't lease it to.
11   Q.  Right.  How about?
12       A.  Some of it was very, very extensive, some
13   of it was extremely extensive.  So there would be
14   records of it somewhere, but I can't think of any
15   specific record we kept on a deal that didn't go
16   through, but some of it was very extensive.
17   Q.  But to the extent there were these discussions,
18   you don't know if any of them -- put it this way, if
19   they weren't in the paperwork that was provided to
20   me by their counsel, would it be anyplace else?
21       A.  Then I couldn't know where they were, no.
22   Q.  Okay.  Sir, did you -- was the -- was there any
23   heating system that was dedicated to the second and
24   third floor of the building?

12 (Pages 42 to 45)

Page 46

1    A.  Just the heat from the first floor heated
2    the second and third floor.  We never really needed
3    heat.  The guy that operated the second floor never
4    used heat.  Operated there 25 years, never used
5    heat.
6    Q.  Were there heating systems that could have been
7    used to heat the second and third floor?
8    A.  It's my understanding they could have
9    been, yes.  It's my understanding you couldn't be
10   out there, you probably couldn't do -- we didn't
11   need to.  We also had that option we could have
12   supplied supplemental heat to the second and third
13   floor if we needed to.  We didn't need to.
14        MR. GABLE:  And let me mark this next.
15
16                    *  *  *
17        (Whereupon, Exhibit Diemer-6 was marked
18   for identification.)
19                    *  *  *
20
21   BY MR. GABLE:
22   Q.  Sir, I'm going to show you what we've marked as
23   Diemer-6.  It's got a bates label of 1323 and it's a
24   December 13, 2002 letter from Emil DiTullio --

Page 47

1    D-I-T-U-L-L-I-O -- from Peerless Insurance to Connie
2    White at Professional Property Management.
3    A.  Right.
4    Q.  Sir, do you recall seeing this document before
5    today, other than with counsel?
6    A.  No.
7    Q.  Do me a favor and -- strike that.
8        Did you ever have insurance on the building
9    through Peerless Insurance?
10   A.  You know, I don't remember Peerless
11   specifically.  We always had insurance on the
12   building.
13   Q.  Okay.  The letter is directed December 13, 2002
14   to Connie White.  At that time was she the property
15   manager for the building?
16   A.  Yes.
17   Q.  The letter describes Mr. DiTullio's visit to
18   the property.  Do you recall any discussions about
19   with Connie White about Mr. DiTullio or anyone from
20   Peerless Insurance visiting the building in 2002?
21   A.  I remember that we got a report.  I don't
22   remember -- I didn't remember until we see this the
23   detail of it, but it's a report.
24   Q.  Turn to the second page.

Page 48

1    A.  We probably had one every year.
2    Q.  Okay.  Turn to the second page.  Well,
3    actually, go to the first page for a second.
4    Mr. DiTullio tells Miss White on the second
5    paragraph, "The building was identified with a
6    number of safety hazards and a lack of appropriate
7    maintenance controls.  The list of recommendations
8    for corrective action is outlined on the next page.
9    These recommendations are to be considered
10   mandatory/critical and completion is required.  A
11   lack of response and completion could jeopardize the
12   insurance policy coverage.  Please respond back in
13   the enclosed envelope within 30 days with a plan of
14   action to address these issues."
15        Sir, is this the type of document that would
16   have been brought to your attention?
17   A.  Probably.
18   Q.  And given the recommendation of the insurance
19   company that the issues in here were
20   mandatory/critical and the completion is required,
21   would you have directed that the items addressed in
22   the report be taken care of?
23   A.  I don't know what you mean by taken care
24   of.  I would use the word addressed.

Page 49

1    Q.  Okay.  Turn to the second page, the second
2    recommendation, 2-10-02, "The sprinkler system is
3    wet pipe type and the upper floors are all
4    non-heated.  The heating system should be service,
5    inspected and activated for the upper floors and
6    basement to provide at least a 45 degree interior
7    temperature.  This will prevent the potential for
8    sprinkler freezing, pipe break and resulting water
9    damage."
10        What was done to address that recommendation,
11   if anything?
12   A.  I think we just pointed out to them that
13   it was heated.
14   Q.  What do you mean you pointed out to them that
15   it was heated?
16   A.  These kinds of things, you know, we just
17   addressed them.  I think we addressed it with them.
18   I think they issued the policy.  As far as I know
19   they did.
20   Q.  Understood.  But I'm trying to figure out what
21   it is specifically.
22   A.  He's saying that -- he's saying that the
23   second and third floor are non-heated.  We didn't
24   supply a specific heat to them, but they were

Page 50

1    heated. They were heated with -- from the heat from
2    the first floor. They weren't -- the second and
3    third floor weren't cold.
4    Q.  Sir, I'm just reading what he wrote.
5        A.  I agree. I read what he wrote, too. As
6    far as I know the policy, we just told him it was
7    heated. I'm paraphrasing, we told him it was
8    heated.
9    Q.  He's recommending at least in what he wrote
10   here that the heating system for the second and
11   third floor should be turned on, is that what he's
12   saying?
13       A.  Well, he is saying that at that point,
14   yes.
15   Q.  Okay.
16       A.  We didn't do that and they continued the
17   policy.
18   Q.  Okay.
19       A.  We addressed it in a different way.
20   Q.  Go down three more to 2-10-05. "The roof is in
21   poor condition with a severe leak problem. The
22   services of a roofing contractor should be obtained
23   to provide new resurfacing and corrective repairs."
24       Do you recall addressing that recommendation?

Page 51

1        A.  Yes.
2    Q.  How did you --
3        A.  I don't remember this one, but I know we
4    had to continually service the roof.
5    Q.  Okay. Sir, did anybody ever report to you that
6    when the leak of March 4th, 2009 was investigated
7    that one or more of the windows shown on Diemer-2
8    was found to be opened?
9        A.  No, they didn't.
10   Q.  Okay. No one's ever told you that?
11       A.  In connection with the litigation I've
12   heard that.
13   Q.  Not before?
14       A.  That's all.
15       MR. GABLE:  Mark that.
16
17           *  *  *
18       (Whereupon, Exhibit Diemer-7 was marked
19   for identification.)
20           *  *  *
21
22   BY MR. GABLE:
23   Q.  Sir, I'm just going to show you an e-mail that
24   we've marked as Diemer-7. Just for the record, I

Page 52

1    believe and counsel can correct me if I'm wrong, but
2    that Mr. Rohner produced some e-mails and we haven't
3    bates labeled them.
4        MR. KANCHER:  Yes, I think that is one.
5        MR. GABLE:  One of those that he
6        produced?
7        MR. KANCHER:  Yeah.
8    BY MR. GABLE:
9    Q.  Just take a second and read through it. The
10   second e-mail at the bottom, the second portion was
11   the e-mail from Laura Hart to Craig and yourself on
12   Friday March 6th, so if you could read that?
13       A.  Okay.
14   Q.  Do you recall getting this e-mail?
15       A.  I think so, yes.
16   Q.  Now, Laura mentions in the last paragraph that,
17   "When the sprinkler company was investigating the
18   pipes, they found another, unrelated 3/4 inch pipe
19   running from a radiator system to a bathroom in the
20   basement. It has apparently been on and running for
21   years. There is a drainage system, however, the
22   water did cause quite a bit of damage and mold.
23   This has not yet been turned off. I need direction
24   from one of you on how to handle this."

Page 53

1        Do you recall learning about that from Laura?
2        A.  I remember learning about it generally,
3    yes.
4    Q.  If you look at the e-mail above it from Craig
5    Rohner, his response, he says, "The 3/4 inch line
6    probably goes back to when the basement was used by
7    the IRS."
8        Is that what you believed as well?
9        A.  No.  I didn't remember it that way, but he
10   apparently did.
11   Q.  That's fine. What do you remember it as?
12       A.  I don't remember there being any issue
13   with the 3/4 inch line until I saw this. The IRS
14   never complained or anything. I mean, I just don't
15   remember it in connection with the IRS, but the IRS
16   used the basement, as far as I know there wasn't any
17   leaks. We know there wasn't any complaint. They
18   came back the next year.
19   Q.  Do you know was the -- she refers to, "The
20   water caused quite a bit of damage and mold," do you
21   know whether that damage and mold was repaired?
22       A.  I doubt it.
23   Q.  Why do you doubt it?
24       A.  We just shut the building down.

14 (Pages 50 to 53)

Page 54

1   Q.  Okay.
2       A.  I'm just going to take a break again.
3   Q.  Sure.
4
5                   * * *
6       (Whereupon, a brief recess was taken.)
7                   * * *
8
9   BY MR. GABLE:
10  Q.  Sir, back to Diemer-7 for a second.
11  Mr. Rohner's recommendation in the first paragraph
12  says, "My vote would be to bit -- I think he meant
13  bite -- the bullet and fix the mold problem now
14  before we are forced to at a later time."
15      Does reading that change your opinion one way
16  or another whether that was fixed?
17      A.  I just don't know.
18  Q.  You just don't know.  Okay.
19      MR. GABLE:  Mark that.
20
21                  * * *
22      (Whereupon, Exhibit Diemer-8 was marked
23  for identification.)
24                  * * *

Page 55

1   BY MR. GABLE:
2   Q.  Sir, I'm going to show you what we've marked as
3   Diemer-8. It's got a bates label 0632. It was also
4   marked as Hart-9. It was a March 23, 2009 letter to
5   7th and Allen Equities from the Building Code Office
6   from the City of Allentown.
7       A.  I saw a number of these. I don't remember
8   this specific one, but I don't think there's more
9   than one of these, so yes.
10  Q.  Do you recall there being -- the Town of
11  Allentown got involved with the building
12  specifically followed the March event?
13      A.  Yes.
14  Q.  Okay. And do you recall that the building was
15  cited for the violations found on the second page of
16  this document?
17      A.  Yes.
18  Q.  What, if anything, did 7th and Allen do to
19  resolve the violations on the second page?
20      A.  You know, I can't tell you about every
21  one. I know we removed the water soaked items.
22  Q.  Okay.
23      A.  We dried the floor.
24  Q.  Okay.

Page 56

1       A.  We certainly didn't replace the windows.
2   We may have braced them additionally or tried to
3   find out what we want -- he wanted. I don't know.
4   We didn't replace the windows.
5   Q.  Why not?
6       A.  I think we did repair the roof.
7   Q.  Okay. If you didn't replace the windows, do
8   you know why not?
9       A.  Just didn't seem to be called for. I
10  think he just backed off on that.
11  Q.  Okay.
12      A.  I think we probably replaced the ceiling
13  tiles.
14  Q.  Okay.
15
16                  * * *
17      (Whereupon, Exhibit Diemer-9 was marked
18  for identification.)
19                  * * *
20
21  BY MR. GABLE:
22  Q.  Sir, I'm going to show you what we've marked as
23  Diemer-9, the same document marked as Hart-10 and
24  it's bates labeled 0772. It's a May 27, 2009 letter

Page 57

1   to Patrick Roels.
2       A.  From Patrick.
3   Q.  It's from Patrick to Laura Hart at Professional
4   Property Managers.
5       A.  Now I got the right one.
6   Q.  If you look at it, if you go back to
7   Diemer-8 --
8       A.  Right.
9   Q.  -- and look at the second page, you'll see that
10  your daughter was responding to the various
11  violations noted.
12      A.  Uh-huh.
13  Q.  Sir, it looks just to I think correct the
14  record, although you can tell me if I'm wrong, she
15  represents to Mr. Roels that the windows were
16  replaced in May of 2009?
17      A.  It's just not consistent with what I
18  remember, but I agree that's what she said.
19  Q.  That's what she said. And having read that, do
20  you -- does that refresh your recollection or you
21  still think you didn't replace the windows?
22      A.  No, I don't remember replacing the
23  windows.
24  Q.  Okay. Would that have been something that

Magna Legal Services

Page 58

1  would have been approved by you, a job like that?
2      A.  You know, I don't remember.  I may have
3  approved it as a part of a bunch of other stuff, but
4  I don't remember specifically approving that.
5      Q.  Okay.  She also represents that at least in
6  here, I guess, that she calls it cleanup trash/water
7  extraction/drying/ventilation/carpet removal took
8  place between 3-4-09 and 5-13-09.  Is that also
9  consistent with your recollection?
10      A.  Yes.
11      Q.  Now, did there come a time following the
12  cleanup from the March event where there were
13  subsequent water issues in the building, meaning
14  water leak issues?
15      A.  Yeah.  I think somebody damaged the pipe
16  or something and we had a second event.
17      Q.  How about with the roof, do you recall
18  complaints from the tenant Rite Aid that the roof
19  had leaked?
20      A.  We did -- we had, it's a difficult roof.
21  So yes, we had complaints that the roof leaked and
22  when they complained the roof leak, we fixed it.
23      Q.  When you say it was a difficult roof, what was
24  the problem with the roof in the building?

Page 59

1      A.  Just the way it was built.  It was built
2  100 years ago.  It was a roof that would perpetuate
3  leaks from time to time and we would fix them.
4      Q.  Was it a flat roof with a rubber membrane?
5      A.  Pretty much, yes.
6      Q.  And do you recall when the membrane that was up
7  there had been originally installed?  How old was
8  it?
9      A.  No, I don't know.
10      Q.  Had you replaced the roof in the time you owned
11  the building?
12      A.  I don't remember replacing it as such.  I
13  remember repairing it, some were extensive, some
14  repairs were less extensive.
15      Q.  Okay.
16          MR. GABLE:  Mark that.
17                * * *
18          (Whereupon, Exhibit Diemer-10 was
19  marked for identification.)
20                * * *
21
22
23  BY MR. GABLE:
24      Q.  I'll show you what we marked as Diemer-10.  And

Page 60

1  it's a series of e-mails bates labeled 611 through
2  614.  Sir, in the interest of full disclosure, you
3  weren't copied on any of these, so I don't want to
4  suggest you've seen these before today.  I just
5  wanted to find out, and take a second and look
6  through them, as to whether or not you recall the
7  complaints that are lodged by Rite Aid in these
8  e-mails, whether you recall them in and around June
9  of 2009?
10      A.  They're just the kind of thing that
11  happens.  So these don't stand out to me as
12  opposed -- as unique from any other.
13      Q.  Okay.  Did Rite Aid after the event of March
14  4th, 2009 did Rite Aid remain in the building?
15      A.  Yes.
16      Q.  And when did they eventually leave?
17      A.  I think they left after the second event.
18      Q.  Okay.  And do you know why they left?
19      A.  I think because the town was still
20  alleging code violations from the first incident
21  and, you know, I think there were some other things
22  going on.  I know the town was trying to induce them
23  to go into the building that the town owned or had
24  some reason for wanting them to go into another

Page 61

1  building across on the other side of town.
2      They had a great deal of issues with not being
3  able to get the scripts to the people if the
4  building was closed.  People whose prescriptions
5  were sitting on the counter, people coming to the
6  door to pick up their prescriptions, which they
7  needed, and they couldn't dispense the prescriptions
8  to them because the store was closed.  And that was
9  a major issue with them.  Very high volume store.
10      Q.  Let's talk about you said that you thought
11  there were code violations from the first incident
12  that hadn't been resolved.  What were those, if you
13  know?
14      A.  I don't know.
15      Q.  Okay.
16      A.  I don't know specifically.  I just know in
17  general we couldn't do all the work to the building.
18  The insurance company wouldn't pay us and we just
19  made the building -- you know, just took care of
20  life safety issues.
21      Q.  What is it that you believed that you had to do
22  with regard to the first incident that you didn't
23  do?
24      A.  We didn't do -- we didn't do much of

16 (Pages 58 to 61)

Magna Legal Services

Page 66

1    D-12 -- the second is the July 20th is a series of
2    code violations. Do you also recall getting that
3    document?
4        A.  Yes.
5    Q.  Did that also come after the second event?
6        A.  Yes.
7    Q.  And who is S. David Fineman?
8        A.  He was an attorney that was representing
9    me at the time.
10   Q.  Okay.  And is it your understanding that these
11   were the code violations in regard to the second
12   incident?
13       A.  I don't remember them that way.  Frankly,
14   I don't remember the first incident, second
15   incident.  It was all sort of one as far as I'm
16   concerned, but the way you're phrasing it.  Well, I
17   mean you can -- you can see for yourself from the
18   dates that it's after the second incident.
19   Q.  Were the issues in the second, when I say --
20   let's put it this way, in the July 20th list of code
21   violations, were they addressed by 7th and Allen
22   Equities to the satisfaction of the Town of
23   Allentown?
24       A.  No.

Page 67

1    Q.  And why not?
2        A.  Well, the primary, I guess there was a lot
3    of reasons.  The primary reason was we couldn't
4    collect money from the insurance company.
5    Q.  Okay.  Did you not have the money available to
6    do the repairs?
7        A.  Well, 7th and Allen Equities was a single
8    purpose LLC.  The only thing it did was own this.
9    It had no funds.
10   Q.  How did it get funds?
11       A.  We had to rely on capital contributions,
12   Craig Rohner and I.
13   Q.  Did you and Craig Rohner have sufficient funds?
14       A.  We didn't have five million dollars
15   available.  No, we didn't have money available to
16   restore the building.  We didn't have money
17   available to accomplish that absent the insurance
18   company paying us, no.
19   Q.  What did you understand the scope of repair
20   that was necessary to fix the water damage from the
21   March 4th, 2009 loss?  I don't mean now, back then
22   what did you understand you had to do?
23       A.  We never could get a complete grip on it,
24   on all of what was going to be entailed because it

Page 68

1    just seemed to keep going on and on.  The longer
2    that we couldn't do the repairs, it seems to be
3    getting worse almost to this day to some extent,
4    but -- can you just read back the question to me
5    again?  I may have already answered it.
6
7                        *  *  *
8        (Whereupon, the court reporter read back
9    the pending question.)
10                       *  *  *
11
12       THE WITNESS:  I couldn't get a grip on
13   that.
14   BY MR. GABLE:
15   Q.  Why couldn't you get a grip on it?
16       A.  We couldn't get any single purpose -- any
17   single company to give us a complete total estimate
18   of what it was going to go to restore the building
19   after the first loss.  Which again, the first loss
20   and the second loss to me were all the same.
21   Q.  Well, as to the -- as to the first loss, what
22   companies did you engage to go out and assess the
23   damage that was caused by that event?
24       A.  Well, my son-in-law took the lead on it

Page 69

1    and he used all the resources he had to try to get
2    us estimates.  Craig Rohner was in the construction
3    industry and he tried to play an active role in it,
4    but I went out and looked at the building and did
5    the best I could, but we couldn't get a complete
6    estimate.  And as we were trying to go through that,
7    it almost seemed like it was getting worse because
8    it was sitting and we just couldn't get an estimate
9    on what it was going to cost to restore the
10   building.
11   Q.  What efforts did you take to try to get an
12   estimate of what it would take?
13       A.  I think my son-in-law was there every day,
14   Craig Rohner was there, he was involved in trying to
15   help trying to put something, an estimate.  I was
16   trying to put together an estimate.  We had three to
17   four pretty talented people, as good as a talent, we
18   couldn't do it, get together an estimate.
19   Q.  Other than yourself, Mr. Rohner and your
20   son-in-law, anybody else that you engaged to assist
21   with that process of trying to develop a scope of
22   repair from the March 4th, 2009 water leak incident?
23       A.  The answer to it is yes, I can't tell you
24   exactly who because I don't remember exactly who

18  (Pages 66 to 69)

Page 70

1  sitting here, but the answer is yes.  We used every
2  resources we could to try to get an estimate.  We
3  couldn't get our hands around it.  It was just too
4  much, too big.
5  Q.  It was impossible to develop a scope of repair
6  from that?
7      A.  Yes.  We could not get our hands around
8  it.
9  Q.  If it was impossible to develop a scope of
10 repair, it was impossible to determine whether you
11 could afford to repair it?
12     A.  No.  We were trying to get the cooperation
13 of the insurance company, but the insurance company
14 was refusing to cooperate with us.  Without the
15 insurance company's cooperation, we couldn't get our
16 hands around it.
17 Q.  Why not?
18     A.  We couldn't get our hands around it.  Why
19 not, I don't know why not.  We couldn't get our
20 hands around it.  We couldn't get any cooperation
21 from the insurance company.  We were trying to talk
22 to the insurance company, at the same time we were
23 trying to get estimates on the repairs in a
24 compressed timeframe.  We couldn't get our hands

Page 71

1  around it at the time.
2  Q.  I guess my question is ignore the insurance
3  company for a second.
4      A.  Okay.  I'm having a couple problems with
5  the way you're framing the question.  That's causing
6  my answers maybe to sound -- in any event, it's
7  frustrating for me.  And frustrating for me there's
8  a couple things you're saying when you ask me the
9  questions in a certain way.  It's hard for me to
10 answer them.  I'm answering them the best I can.
11 Q.  I appreciate that and I will do my best to try
12 to ask my questions as clearly as I can.  But you
13 know what, let's do it this way.
14
15            * * *
16     (Whereupon, Exhibit Diemer-13 was
17   marked for identification.)
18            * * *
19
20 BY MR. GABLE:
21 Q.  Sir, I'm going to show you what we've marked as
22 Diemer-13.  It's bates labeled 686 through 688 and
23 it's a letter, a memo from Bill Hart to yourself
24 dated August 2nd, 2009.  Sir, do you recall getting

Page 72

1  this document?
2      A.  Yes.
3  Q.  And just so the record is clear, Bill Hart is
4  your son-in-law?
5      A.  Yes.
6  Q.  And I believe your earlier testimony was that
7  you asked Mr. Hart to assist you with developing a
8  scope of repair --
9      A.  Uh-huh.
10 Q.  -- to the building?  Is this a report that he
11 gave you as part of his work in that regard?
12     A.  Yes.
13 Q.  Now, he's outlining for you the repairs that he
14 feels are necessary to fix the building.  First, why
15 don't you get D-12, Diemer-12 because I think if we
16 look at Diemer-12 and Diemer-13 together, we can see
17 what the code violation was and match that up.
18     A.  Okay.
19 Q.  With his letter.  Now, the first code violation
20 was 1754.02, "Repair brickwork, point brickwork to
21 weather-tight and watertight sound condition free
22 from growth of vegetation and leaks."
23     Sir, first question to you is the citation
24 here, is that the result of the March 4th, 2009

Page 73

1  sprinkler leak?
2      A.  No, I don't think so.
3  Q.  Okay.  Mr. Hart reported to you that he
4  estimated that that could be repaired for an
5  estimate of $20,000.  Do you know whether that work
6  was ever done?
7      A.  I don't think so.
8  Q.  Okay.  Second violation 1754.02, "Repair -- I'm
9  sorry -- replace or repair roof, leaks evident."
10     Mr. Hart's response is, "Inspector feels
11 patching is not going to cut it.  Roof has been
12 leaking for probably 20 plus years.  Roof deck is
13 poured concrete and its integrity is in question.
14 Leaks are evident by all the slagmites/stalagtites
15 coming down off the ceiling throughout the third
16 floor.  Leaks have also loosened up approximately
17 2,000 square feet or so of asbestos floor tile,
18 which the inspector questioned if it is okay to
19 leave these.  We will probably be asked to supply a
20 report.  Roof leaks have traveled throughout floors
21 3, 2 and 1 and are the main reason the building is
22 condemned.  We are waiting on costs, we should have
23 them by the afternoon of 8/4, but will probably be
24 in the $200 to 300K range."

Page 74

1    Do you recall getting that report from Mr.
2  Hart?
3    A.  Yes.
4    Q.  He refers to what he writes slagmites and
5  stalagtites on the third floor.  Do you recall
6  seeing those when you were in the building?
7    A.  I remember seeing evidence that there had
8  been leaks.
9    Q.  And when did you recall seeing that, the
10  evidence of leaks throughout the time that you owned
11  the building or were they in the specific period of
12  time?
13    A.  No, I think they were there when they
14  bought the building.
15    Q.  Okay.  With regard to his comment that, "Roof
16  leaks have traveled throughout floors 3, 2 and 1 and
17  is the main reason the building is condemned,"  do
18  you agree or disagree with that statement?
19    A.  No, we couldn't get a grip on the reasons
20  the building was condemned.  We were trying to get a
21  grip on it and we didn't get a grip on it.  We don't
22  know why the building was condemned.  I was much
23  more involved in it than Bill was.
24    Q.  Why do you say that?

Page 75

1    A.  I had a number of citations and court
2  hearings up there that I had to deal with and we
3  could not get a grip on all the reasons why the
4  building was condemned.  They would give us a reason
5  and add additional reasons.  I don't think he knew
6  that.  I think he's saying the best he knew, but he
7  was wrong.
8    Q.  Okay.  Did you ever make the repairs that he
9  suggests here on the roof?
10    A.  We did make repairs to the roof, we did
11  not replace the roof.
12    Q.  And was that the roof work, was that related to
13  the March 4th, 2009 sprinkler leak incident?
14    A.  No.
15    Q.  Go to 1750, just look at --
16    A.  I just got to take a break for a minute.
17    Q.  Sure.
18
19            *  *  *
20    (Whereupon, a brief recess was taken.)
21            *  *  *
22
23  BY MR. GABLE:
24    Q.  Sir, if you would, before we broke we were

Page 76

1  looking at the violations listed in the July 20th,
2  2009 letter.  The fifth violation 1756.07 says,
3  "Remove all water soaked, damp, rotting items from
4  all spaces in building."
5    Now, if I understood your testimony before, did
6  you remove water soaked items from the building
7  following the March 4th event, had that work already
8  been done with regard to the first event?
9    A.  You know, I'm having a problem with that
10  because I don't remember it was a first event and a
11  second event.  The answer is we removed the items
12  from the building, whether we removed them before or
13  after, I don't know.  I just know we removed the
14  items from the building.
15    Q.  Okay.  Following the -- following the building
16  being declared unfit for human habitation, which was
17  in the July 8, 2009 notice from the city did Rite
18  Aid vacate the building?
19    A.  Yes.
20    Q.  Did they declare default on the lease?
21    A.  I don't remember that.  They may have.
22    Q.  Okay.  And have they ever returned since?
23    A.  No.  No.  Haven't opened it for business
24  since, I rather say it my way.

Page 77

1    Q.  Okay.  That's fine.  Have you been involved in
2  negotiations to try to get Rite Aid back into that
3  building or for them to take over the site or put
4  that space to some use?
5    A.  I've been involved with the developer who
6  proposed to demolish the building and build a new
7  Rite Aid.
8    Q.  Okay.
9    A.  Hasn't been working out.
10    Q.  When did those discussions begin?
11    A.  I'm just going to give a general
12  timeframe.  The answer is I don't know, but to try
13  to answer your question, I believe it's been within
14  the last year.
15    Q.  Okay.  Do you know who the developer is you're
16  working with?
17    A.  I don't know their formal name.
18    Q.  How do you know them?
19    A.  Joseph Pacera -- P-A-C-E-R-A.
20    Q.  And did you know Mr. Pacera before the March
21  2009 event?
22    A.  Probably knew him.  I didn't know him in
23  connection with this property.
24    Q.  Okay.

20  (Pages 74 to 77)

Page 98

1    Q.  I'm just going back to Exhibit 17.  On the
2    second page, first full paragraph, you write, "We
3    also note that the Property was not "vacant" in
4    March 2009.  Rite Aid leased approximately two
5    thirds of the first floor of the Property.  7th and
6    Allen used significant portions of the second and
7    third floors of the property to store equipment and
8    other materials that are incidental to its business
9    and part of its customary business operations."
10       What type of materials and equipment and other
11   materials were you storing on the second and third
12   floors?
13       A.  We had all of the equipment from the
14   assembly operation stored on the second floor.  It
15   was full of equipment.  And I don't remember
16   specifically what was on the third floor.  There was
17   some things on the third floor, but I don't remember
18   specifically what they were.
19       Q.  Do you remember generally?
20       A.  No, I don't.  I don't remember right now,
21   no.
22       Q.  You say in the next paragraph, "The estimated
23   cost to repair the damage from the March 2009 Loss
24   is $1,676,332.  We've attached an estimate

Page 99

1    reflecting how that repair cost was calculated."
2        And I think if I go to the last page, I see
3    the -- I see a breakdown of that number, is that
4    correct?
5        A.  Yes.
6        Q.  Okay.  Now, who compiled the number here on
7    bates labeled 27, the fourth page of the exhibit?
8        A.  I don't know.
9        Q.  Did you have any role in compiling it?
10       A.  It's possible, I don't know.  I just don't
11   remember this.
12           MR. GABLE:  Mark this as the next.
13
14              * * *
15       (Whereupon, Exhibit Diemer-18 was
16   marked for identification.)
17              * * *
18
19   BY MR. GABLE:
20       Q.  I'm just going to show you what we've marked as
21   Diemer-18.  It is bates labeled 1236 through 1239.
22   Second page of that is a fax from Laura to Craig
23   Rohner.  It says, "Enclosed are the invoices I would
24   like copied as part of our insurance claim that

Page 100

1    George and I are going to file against Hartford
2    Insurance.  We will need at least three copies.  If
3    any of these seem questionable, let's discuss.
4    Thank you."
5        Notice beyond that is a list of invoices, some
6    of which you will need a help of some sort of
7    forensic person to read, but the total $231,409.93,
8    which is -- which is almost the precise amount
9    that's found in your letter of January 4th, 2011.
10   You see that?
11       A.  I see -- I see this.
12       Q.  Yes.
13       A.  I don't see the number you're talking
14   about.
15       Q.  Go back to the last page, we have the
16   spreadsheet out, not the letter but the very last
17   page there.
18       A.  Okay.
19       Q.  One more.
20       A.  Okay.
21       Q.  You see a list of bills paid out of pocket
22   231,200?
23       A.  I do see it.
24       Q.  Laura has compiled a spreadsheet $231,409?

Page 101

1        A.  Here?
2        Q.  The one we were just talking about.
3        A.  Laura compiled this?
4        Q.  Well, it's her -- I'm looking at her fax cover
5    sheet.
6        A.  No, she didn't compile this.  I mean, I
7    can't identify this as something she compiled.  I
8    don't recognize the handwriting.  I don't think she
9    compiled that, but I don't know.  I don't know who
10   compiled that.
11       Q.  Okay.  Look at the fax on the second page of
12   this and this came from your files, didn't come from
13   mine.
14       A.  No, right.  I understand that.
15       Q.  The fax on the second page from Craig to
16   Laura -- I take it back and I think you're correct,
17   I read it incorrectly.  Craig to Laura says,
18   "Enclosed are the invoices I would like copied as
19   part of our insurance claim."
20       Is it your recollection that Craig compiled
21   these invoices for use in part as part of your
22   insurance claim?
23       A.  I don't have an independent recollection.
24   If he did, he did, I don't recollect any of it.

26 (Pages 98 to 101)

Magna Legal Services

Page 102

1  Q. Did you use the figure or was the figure found
2  at the bottom of the last page of this exhibit, this
3  exhibit being 18, was that the figure that you used
4  in your compilation of damages in 17?
5     A. It appears to be.
6  Q. Okay. How did -- if you know, how was it
7  determined what bills were going to go in this list
8  of bills paid out of pocket?
9     A. We -- which was primarily not me, but we
10  did it with the advice of counsel.
11  Q. Okay.
12     MR. GABLE: Go ahead and mark this one as
13  the next.
14
15          * * *
16     (Whereupon, Exhibit Diemer-19 was
17  marked for identification.)
18          * * *
19
20     MR. GABLE: I do not have an extra copy of
21  this one, just take a second and look at it.
22     MR. KANCHER: Okay.
23  BY MR. GABLE:
24  Q. Sir, I'm going to show you what we've marked as

Page 103

1  Diemer-19. It's also bates labeled number 66. And
2  it appears to be an invoice, the top part looks like
3  it was cut off, but given what it says in the
4  address on it, I believe it's from WMH Construction,
5  LLC. Do you see that?
6     A. Yes, I do.
7  Q. Do you recognize that as a bill from 7th and
8  Allen from WMH Construction, LLC?
9     A. Appears to be, yes.
10     MR. GABLE: Go ahead and mark this as the
11  next.
12          * * *
13     (Whereupon, Exhibit Diemer-20 was
14  marked for identification.)
15          * * *
16
17  BY MR. GABLE:
18  Q. A lot of paper juggling here. I'm going to
19  hand you Diemer-20. Diemer-20 is a contract with
20  Swiderski -- S-W-I-D-E-R-S-K-I -- Contractors, Co.
21  and 7th and Allen Associates to do certain work on
22  the roof of the building. Do you recall entering
23  into a contract with Swiderski Contractors --
24     A. Yes.

Page 104

1  Q. Let me finish -- on or about August 12th, 2009
2  to do work on the roof?
3     A. Yes.
4  Q. What was your understanding of the scope of
5  work Swiderski was going to do?
6     A. I don't remember.
7  Q. Now, if I look at the last part, look at page
8  1143.
9     A. Uh-huh.
10  Q. And it looks like you're obligated to give
11  three separate payments, $58,693, is that correct?
12     A. Yes.
13  Q. Do you recall that the work to be done was with
14  regard to fixing the roof of the building --
15     A. Yes.
16  Q. -- at 7th and Allen? Now, was that work -- was
17  that work subcontracted through WMH Construction?
18     A. I don't remember.
19  Q. Take a look now, I'm going to work backwards,
20  look at the WMH Construction invoice.
21     A. Yes.
22  Q. It should be also in that packet you have
23  there.
24     A. Okay.

Page 105

1  Q. Does that invoice contain a bill from Swiderski
2  for one third the contract price of $58,693 for work
3  on the roof?
4     A. That's what that invoice says, yes.
5  Q. So that was included in the invoice that was
6  paid to WMH in the amount of $98,000 and you might
7  have to read the rest to me there.
8     A. It appears to be the same.
9  Q. Yeah, okay. Now, working backwards again to
10  the spreadsheet, if we look at the bills paid out of
11  pocket spreadsheet, in the first section we have
12  what's called non-recoverable repairs and we have a
13  bill for 10-1-09, third from the bottom, WMH
14  Construction accounts payable in the amount of
15  98,000 and change. Do you see that?
16     A. Yes.
17  Q. Okay. So does it appear -- does it appear that
18  the WMH, you're going to have to pull these out
19  because I don't have copies, but does it appear that
20  the WMH invoice that is dated Diemer -- labeled
21  Diemer-19 is included in the compilation of the
22  $231,000?
23     A. You know, it's a stretch. I don't know.
24  Q. What do you mean it's a stretch?

Page 114

1    Q.   Now, I think we looked at the letter from Laura
2    early on that said there was mold found in the
3    basement as a result of the three quarter inch pipe
4    leak.  Do you recall that?
5        A.   Yes.
6    Q.   What steps did you take to differentiate the
7    mold from the pipe leak from what you're claiming
8    here?
9        A.   I'm not sure we were differentiating as
10   we're sitting here today.  That's an assumption
11   you're making, I'm not comfortable with, but I
12   believe the mold areas were in different parts of
13   the building.
14   Q.   Well, you've got 22,000 square feet as the
15   footprint of the basement.  Does that appear
16   correct?
17       A.   Yes.
18   Q.   So it doesn't appear any portion of the
19   basement has been carved out of this calculation.
20       A.   I don't know that sitting here today.  I
21   see what you're referring to and I think what your
22   question is, but I don't know what the answer to it
23   is.
24   Q.   Now, going back to the Exhibit 17, you say that

Page 115

1    in the second paragraph you say, "In your letter,
2    you asked what measures 7th and Allen took to
3    protect the sprinkler system from freezing.  The
4    building was heated pursuant to the terms of 7th and
5    Allen's lease with Rite Aid."
6        Did it require it to heat any portion of the
7    building other than the leased space?
8        A.   That was all that was required.  They
9    heated their space.
10   Q.   The lease required them to heat their space?
11       A.   I'm not sure I would say it exactly that
12   way.
13   Q.   Well, --
14       A.   The lease didn't require them to -- the
15   lease didn't require them to heat the third floor of
16   the building, but it did because they couldn't heat
17   the first floor without heating the third floor.
18
19                    *  *  *
20       (Whereupon, Exhibit Diemer-21 was
21   marked for identification.)
22                    *  *  *
23
24   BY MR. GABLE:

Page 116

1    Q.   I'm going to show you what we marked Diemer-21.
2    It's the 2009 Partnership Income Return for 7th and
3    Allen Equities, LLC.
4        A.   Okay.
5    Q.   You see that?
6        A.   Yes.
7    Q.   Sir, if you would turn to -- you're going to
8    have to go to the tenth page.  They're not numbered,
9    so you're going to have to just thumb through.  It
10   looks like this.
11       MR. KANCHER:  Let me see what you're
12   holding up, Rich.  Okay.
13       THE WITNESS:  Okay.
14   BY MR. GABLE:
15   Q.   Sir, before I even ask you this, do you recall
16   having seen this document before today?
17       A.   No, I don't.
18   Q.   Would it be your practice to review the
19   Partnership Income Tax Return of 7th and Allen
20   Equities before it's filed?
21       A.   No.
22   Q.   And why not?
23       A.   I don't think I have any specific reason
24   not to.  I just didn't have any specific reason to

Page 117

1    review it so I don't.
2    Q.   I'm confused.  Do you have -- you don't have a
3    recollection of reviewing this.  My question is is
4    that something in your normal practice as an owner
5    of the --
6        A.   Unless I had a specific reason to review
7    it, I wouldn't.
8    Q.   Okay.  The document itself is prepared by Paul
9    Martella?
10       A.   Yes.  It appears to be, it's not signed.
11   Q.   And I'll just represent to you that this was
12   provided to us, it's not bates labeled, but it was
13   produced to us, I believe, by Craig Rohner a couple
14   days ago before his deposition.
15       A.   Okay.
16   Q.   Now, in this section it says, "Explanation for
17   large operating loss."
18       Do you have an understanding that as part of a
19   filing with the IRS that 7th and Allen Equities
20   would have to give some explanation if it was
21   showing a large operating loss?
22       A.   I don't -- I don't get involved in these
23   things to that level.
24   Q.   Okay.  It says in this paragraph, "This rental

30 (Pages 114 to 117)

EXHIBIT "G"

EXHIBIT "G"

{00247877;1}

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 5:11-cv-01567

7th & ALLEN EQUITIES,          :
    Plaintiff,             :
                        :
       vs.                :
                        :
HARTFORD CASUALTY INSURANCE     :
COMPANY,                        :
      Defendant             :

—  —  —

Tuesday, July 31, 2012

—  —  —

    Oral deposition of BRIAN HANNON, taken pursuant to notice, was held at the Law Offices of Elkind & DiMento, P.A., 2090 East Route 70, Cherry Hill, New Jersey, 08003, commencing at 12:10 p.m. on the above date, before Heather A. Kirsch, a Certified Court Reporter and Notary Public of the State of New Jersey.

—  —  —

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

SIGNATURE REP  TING, INC.

| | Page 10 |
|---|---|

1  estimate, like you just did, I think, say '94,
2  that's great, we would ask that you do that.  If you
3  have to guess, say Mr. Coleman that would be a guess
4  and I don't want you then to guess.
5      A.  Okay.
6  Q.  Do you understand that distinction?
7      A.  Yes.
8  Q.  Okay.  So graduated or took some course work,
9  college in and around '94?
10     A.  Yeah, '94.  Say '91 to '94.
11 Q.  And what did you do after you finished taking
12 course work?
13     A.  I was occupied at Trump Marina.
14 Q.  What was your position at Trump?
15     A.  Various positions.
16 Q.  You tell me what they were?
17     A.  Restaurant management, things like that,
18 marketing.
19 Q.  How long were you at Trump?
20     A.  Say nine years.
21 Q.  You managed a restaurant?
22     A.  Yeah, I was a supervisor.  Yeah.
23 Q.  What else did you do there?
24     A.  I was in marketing, I was a casino host
SIGNATURE REP TING, INC.

| | Page 11 |
|---|---|

1  for a while.
2  Q.  Anything else come to mind?
3      A.  Not off the top of my head, no.
4  Q.  So you think you left Trump in about 2000?
5      A.  No.
6  Q.  Oh, I'm sorry, 2003?
7      A.  Yeah, like '03 or '04, 2003 or '04.
8  Q.  What did you do at that point?
9      A.  I was employed with Professional Property
10 Managers.
11 Q.  PPM?
12     A.  Yes.
13 Q.  How did you become employed with PPM?
14     A.  Just basically I had known George
15 previously.
16 Q.  How did you know George?
17     A.  Just on a friendship, a light friendship
18 level.
19 Q.  When did you first meet George?
20     A.  I don't know.  I don't know, probably in
21 Atlantic City.
22 Q.  Was that within your role at Trump Marina?
23     A.  Yes.  I was a casino host, yes.
24 Q.  So you think you met George during your tenure
SIGNATURE REP TING, INC.

| | Page 12 |
|---|---|

1  at Trump?
2      A.  Well, I knew George prior to that, too.
3  Q.  Okay.  How did you know George prior to that?
4      A.  Just through friends.
5  Q.  Okay.  How long have you known George?
6      A.  I don't know.  A few years probably prior.
7  Q.  A few years prior to meeting him at Trump?
8      A.  Yeah.
9  Q.  Is there any familial connection to Mr. Diemer,
10 George?
11     A.  No.
12 Q.  You're saying George, I mean that's Mr. Diemer,
13 George Diemer?
14     A.  Yes.
15 Q.  Had you done work for George prior to coming to
16 PPM?
17     A.  No.
18 Q.  In addition to being I think friends, you said,
19 had you had any other business relationship or any
20 other contacts with Mr. Diemer?
21     MR. ELKIND:  I just object to the
22 characterization.  I don't think he said he
23 was friends.  He said he knew him, but
24 that's okay.
SIGNATURE REP TING, INC.

| | Page 13 |
|---|---|

1      MR. COLEMAN:  I thought he said
2  friendship, but --
3      THE WITNESS:  No.
4      MR. COLEMAN:  Thank you for
5  clarification.
6  BY MR. COLEMAN:
7  Q.  What was -- how would you describe your
8  relationship with George Diemer during that period a
9  few years before AC Trump Marina and then at Trump
10 Marina?
11     A.  How would I describe it?
12 Q.  Yes.
13     A.  Just on a casual level.
14 Q.  Acquaintance, were you doing stuff for him?
15     A.  Acquaintance.
16 Q.  While you were at Trump?
17     A.  Yeah.
18 Q.  You said you were a casino host?
19     A.  Correct.
20 Q.  I don't know the terminology, is that someone
21 that kind of takes the high rollers around, kind of
22 shows them, gives them comps, whatever?
23     A.  Yeah.
24 Q.  And you knew George through that capacity?
SIGNATURE REP TING, INC.

4 (Pages 10 to 13)

Page 14

1    A.  Uh-huh.
2    Q.  Do you remember how you met George prior to
3    that?
4    A.  No.
5    Q.  Do you know anyone else in Mr. Diemer's family?
6    A.  From after working with him, sure.
7    Q.  Did you know prior to working with him?
8    A.  No.
9    Q.  Is Mr. Diemer paying for your representation
10   here today?
11       MR. ELKIND:  I object.  Don't answer it.
12       MR. COLEMAN:  What's the basis?
13       MR. ELKIND:  My arrangement with
14   Mr. Hannon is confidential.
15       MR. COLEMAN:  You're claiming
16   attorney/client privilege to that?
17       MR. ELKIND:  Yes.
18   BY MR. COLEMAN:
19   Q.  Prior to coming here today did you speak to
20   Mr. Diemer?
21   A.  Prior to, yes.
22   Q.  When was that?
23   A.  I don't remember.
24   Q.  Approximately.

SIGNATURE REP TING, INC.

Page 15

1    A.  Two months ago.
2    Q.  What did you talk about?
3    A.  All kinds of different things, how his
4    work was going and what I'm doing now and things
5    like that.
6    Q.  Did you talk about the lawsuit?
7    A.  Briefly, just about that there was a
8    lawsuit going on, that's about all I know.
9    Q.  Did he tell you anything about it?
10   A.  Not really, no.
11   Q.  Excluding your counsel, did you talk to anybody
12   else about coming here today?
13   A.  No.
14   Q.  So the only two people in the world that knew
15   you were coming here today were George and your
16   attorney?
17   A.  Correct.
18       MR. ELKIND:  I object.  He didn't say that
19   he knew George -- George knew he was coming
20   here today.
21   BY MR. COLEMAN:
22   Q.  Did George know you were coming here today?
23   A.  Today, I don't know today.
24   Q.  Did he know that you had been subpoenaed?

SIGNATURE REP TING, INC.

Page 16

1    A.  He knew, yeah.  Yes.
2    Q.  Is that why you talked to him two months ago?
3    A.  No, not necessarily.  No.
4    Q.  Okay.  Had you, in fact, been subpoenaed two
5    months ago, do you recall?
6    A.  No.
7    Q.  So have you then talked to him since?
8    A.  No.
9    Q.  Have you talked to anybody from PPM recently?
10   A.  No.
11   Q.  Did you look at any documents before you came
12   here today?
13   A.  No.
14   Q.  And my questions are all in reference to this
15   particular lawsuit, the building.
16   A.  Sure.
17   Q.  Okay.  Has Mr. Elkind represented you before?
18   A.  No.
19   Q.  In what capacity have you had your deposition
20   taken before?
21   A.  I don't understand the question.
22   Q.  You said -- I thought you said you had had your
23   deposition taken?
24   A.  Yes.

SIGNATURE REP TING, INC.

Page 17

1    Q.  Okay.  When was that?
2    A.  I don't remember off the top of my head,
3    say '04.
4    Q.  And what did it involve?
5    A.  Just a real estate matter, personal.
6    Q.  A personal real estate matter.  Ever been
7    deposed otherwise?
8    A.  No.
9    Q.  Ever been involved in any other lawsuits?
10   A.  No.
11   Q.  Have you ever testified at trial?
12   A.  No.
13   Q.  When you went to PPM in and around 2003 did
14   George solicit you to come to PPM?
15   A.  Uh-huh.
16   Q.  What or how did he describe the role you would
17   be playing for PPM?
18   A.  It was property management.
19   Q.  And at 2003 or in and around 2003 when you came
20   aboard to PPM how many properties were you the
21   property manager for?
22   A.  I don't remember.  No, I don't remember
23   how many.
24   Q.  More than two?

SIGNATURE REP TING, INC.

Magna Legal Services

Page 22

1  Q.  Were you told that there was any other use of
2  the building at that point?
3      A.  Prior to me getting there?
4  Q.  When you were taking over property manager were
5  you told that there were any other -- was there any
6  other use of the building occurring at that point?
7      A.  At that time, no.
8  Q.  You didn't ever maintain office space at that
9  building, did you?
10     A.  No.
11 Q.  Fair to say that the property management
12 function is run out -- for PPM is run out of the
13 Mount Laurel location?
14     A.  Yes.
15 Q.  So the back office is there, the office space,
16 computers, phones, secretaries, what have you is all
17 in the Mount Laurel location?
18     A.  For, yes.
19 Q.  For PPM?
20     A.  Yes.
21 Q.  Did you maintain or use any space in the 7th
22 and Allen building at any point for your own
23 purposes?
24     A.  No.

SIGNATURE REP TING, INC.

Page 23

1  Q.  Do you know during your tenure as property
2  manager, do you know if anyone from PPM used any
3  space in the 7th and Allen building for property
4  management purposes?
5      A.  No.
6  Q.  You don't know or they did not?
7      A.  They did not.
8  Q.  How -- it's my understanding that you were --
9  strike that.
10     How long were you the property manager for PPM
11 for this particular building?
12     A.  I'd say around four, maybe five years.
13 Q.  So 2003 to 2008ish?
14     A.  Yes.
15 Q.  That often happens, you start to communicate
16 non-verbally.  When you made your first trip up to
17 the building, did you go up with anybody or was it
18 just you?
19     A.  I went up with Connie White.
20 Q.  Connie White.  Did you guys walk the building,
21 do you remember?
22     A.  Yes.
23 Q.  In 2003 you said there were two tenants, there
24 was a Eckerd Drug and that's I think on the first

SIGNATURE REP TING, INC.

Page 24

1  floor?
2      A.  Correct.
3  Q.  There was a thrift store, was that also on the
4  first floor?
5      A.  Correct.
6  Q.  Were there any other tenants on the first
7  floor?
8      A.  No.
9  Q.  Did you guys walk the second and third floors?
10     A.  Yes.
11 Q.  And tell me what the second and third floors
12 looked like in 2003 when you walked them.
13     A.  Just vacant.
14 Q.  Did you have an opportunity to walk the
15 basement of the property at that point?
16     A.  Yes.
17 Q.  What did the basement of the property look like
18 in 2003?
19     A.  Vacant.
20 Q.  In addition to the thrift store and the Eckerd
21 space on the first floor, was there also vacant
22 space on the first floor level?
23     A.  I don't remember.
24 Q.  Did you speak with the Rite Aid, the Eckerd

SIGNATURE REP TING, INC.

Page 25

1  folks at that first visit?  Do you have any
2  recollection?
3      A.  No, I don't remember.
4  Q.  Was it your practice at that point to take
5  field notes or to write kind of reports as to the
6  conditions and what you saw at the property for
7  potential future reference or future use?
8      A.  At that point?
9  Q.  Yes.
10     A.  No.
11 Q.  At any point was that your practice?
12     A.  Yes.
13 Q.  Can you tell me what -- what that practice
14 would entail?
15     A.  Just an overall site visual inspection.
16 Q.  Would you memorialize that in a written
17 document?
18     A.  No.
19 Q.  I think I just misunderstood then.  So you
20 would just go up and just do a site inspection and
21 see what you saw, but not write it down anywhere?
22     A.  No.  Normally, no.
23 Q.  During that first inspection did you talk with
24 Miss White about how the property was heated?

SIGNATURE REP TING, INC.

Page 26

1     A.  No.
2     Q.  At any point after -- or at any point did you
3     talk to Miss White about how the property was
4     heated?
5     A.  I don't -- I don't remember, no.
6     Q.  Was there electrical -- was the second and
7     third floor of the electrified in 2003?
8     A.  You mean was there an electrical panel?
9     Q.  Was it operating?
10     A.  Yeah.
11     Q.  Did you ever accompany Mr. Diemer up to the 7th
12     and Allen property at any point?
13     A.  I don't remember.
14     Q.  Do you remember him going up there ever?
15     A.  I don't remember.
16     Q.  If or did Mr. Diemer ever accompany you to any
17     of your other properties that you were managing for
18     him?
19     A.  Yeah, I'm sure he has.
20     Q.  Do you have a recollection of him doing that?
21     A.  Sure.
22     Q.  But you don't have a recollection of him
23     accompanying you to the 7th and Allen building?
24     A.  I don't remember.  I'm sure he has at one
      SIGNATURE REP TING, INC.

Page 27

1     point.
2     Q.  Okay.  Do you also know Craig Rohner?
3     A.  Name's familiar.
4     Q.  But you don't have any personal relationship or
5     knowledge of who he is or what he does?
6     A.  No, I don't know the name -- I can't.
7     Q.  I'll represent to you that he's a co-owner of
8     the building, that's why it rings a bell?
9     A.  Okay.  Yes.  Yes, now I know.
10     Q.  Did you ever have any contact with Mr. Rohner?
11     A.  No, I don't -- not that I remember, no.
12     Q.  So George is the -- George is the operations
13     guy, Mr. Diemer is?
14     A.  I would say, yes.
15     Q.  After your first site visit with Miss White in
16     2003, any recollection of when the next time you
17     were up at the property was?
18     A.  No, I don't remember.
19     Q.  How many times -- can you estimate how many
20     times you think you were up at the property during
21     your tenure?
22     A.  No, not off the top of my head now.  I was
23     probably there once every other month.
24     Q.  Pretty standard to visit your properties --
      SIGNATURE REP TING, INC.

Page 28

1     A.  Yeah.
2     Q.  -- pretty regularly?
3     A.  Yes.
4     Q.  During your tenure approximately '03 to '08
5     were there ever any other tenants in the building,
6     in addition to the Eckerd Drugs and the thrift
7     store?
8     A.  Not that I remember.
9     Q.  So then fair to say that the second, third and
10     basement spaces that appeared vacant on your first
11     visit, remained vacant during your entire tenure?
12     A.  Uh-huh.  Yeah.  Yes.
13     Q.  Were you involved in the attempt or any
14     attempts to lease those spaces in the building?
15     A.  I've showed it.
16     Q.  What do you recall about showing the property?
17     A.  What do you mean?  I'm not sure if I
18     understand what do I recall.
19     Q.  How many times do you think you showed it?
20     A.  A few times.
21     Q.  A few times in five years?
22     A.  Yeah, I'd say.  Yeah.
23     Q.  Did you, meaning PPM, did you guys use a
24     commercial brokerage company to assist in that
      SIGNATURE REP TING, INC.

Page 29

1     process?
2     A.  I don't remember.
3     Q.  So how then did the process of you showing the
4     property like come to your attention?
5     A.  Just field phone calls.
6     Q.  Okay.  So someone would call up PPM and say I'd
7     like to take a look at the space, you would meet
8     them out there and do that?
9     A.  Correct.
10     Q.  Do you have a recollection as to any -- who any
11     of those people or entities were?
12     A.  No.
13     Q.  Do you know if anyone else was engaged in also
14     showing the property?
15     A.  I don't remember now.
16     Q.  Would you -- would it be your practice if
17     someone wanted to see a property that you were
18     managing, would it be the practice that you would be
19     looped into that you think?
20     A.  If someone wanted, yes.
21     Q.  Was there anyone else at PPM or otherwise that
22     was an assistant or co-manager of any sort?
23     A.  No.
24     Q.  So you were the guy, for lack of a better term?
      SIGNATURE REP TING, INC.

8  (Pages 26 to 29)

Page 30

1    A.  Yes.
2    Q.  To the best of your recollection -- strike
3    that.
4        Did the condition on the second, third or
5    basement of the property, did that change materially
6    over the five years that you were the property
7    manager?
8    A.  Not that I remember, no.
9    Q.  Can you, to the best of your recollection,
10   describe what the third floor looked like during
11   your tenure?
12   A.  No.  It was just from what I remember it
13   looked like the company just picked up and left.
14   Q.  When you say the company, you mean the prior
15   tenant for the space?
16   A.  Yes.
17   Q.  How about the second floor of the building?
18   A.  I don't remember.
19   Q.  And the basement?
20   A.  Basement was just vacant.
21   Q.  I think you said it was your practice to visit
22   each one of your properties either every month or
23   every couple months.  What would that typically
24   entail with respect to this building?

SIGNATURE REP TING, INC.

Page 31

1        MR. ELKIND:  I do not think he quite said
2    that.
3        MR. COLEMAN:  Did you understand the
4    question?
5        THE WITNESS:  Could you repeat it?
6        MR. COLEMAN:  Sure.  Could you read it
7    back?
8
9            * * *
10       (Whereupon, the court reporter read back
11   the pending question.)
12           * * *
13
14       MR. COLEMAN:  Do you understand that
15   question?
16       THE WITNESS:  Yes.
17       MR. ELKIND:  My objection was to every
18   couple months, which was expanded from what
19   he said.
20       MR. COLEMAN:  Can you answer that?  Did
21   you understand?
22       THE WITNESS:  Yeah.  Yeah.  Okay.  I
23   would visually inspect the property, the
24   building, the area, the parking lots, things

SIGNATURE REP TING, INC.

Page 32

1    like that.
2    BY MR. COLEMAN:
3    Q.  So you did a perimeter walk-around?
4    A.  Yes.
5    Q.  Look for broken windows, broken doors?
6    A.  Yes.
7    Q.  Any graffiti, things like that?
8    A.  Yes.
9    Q.  Would that site visit also entail a visit to
10   each floor of the property?
11   A.  Yes.
12   Q.  So you think each time you went up there every
13   month or two months or what have you, you would do
14   an entire walk-through of the property?
15   A.  Yes.
16   Q.  During those walk-throughs did you notice roof
17   leaks at any point?
18   A.  No, not that I remember.
19   Q.  Did you notice or do you have a recollection of
20   any other water leaks in the property during your
21   tenure?
22   A.  No.
23   Q.  If some form of maintenance needed to be done
24   that you noticed at your site inspection, what was

SIGNATURE REP TING, INC.

Page 33

1    the process for then getting that work completed?
2    A.  I would just bid it out and choose the
3    lowest bidder or actually -- yeah.
4    Q.  Did you have to get authority from George or
5    anyone else at PPM to do those kind of routine
6    maintenance things?
7    A.  No.
8    Q.  It was within your scope of authority to bid
9    out a project, bid out a repair, maintenance, what
10   have you, and then execute the contract?
11   A.  Correct.
12   Q.  And was that a standard practice that you
13   undertook with this particular property?
14   A.  Yes.
15   Q.  You would hire outside vendors, outside
16   contractors, specialists, what have you, to come in,
17   address situations or do inspections, what have you,
18   and then you would follow-up with that?
19   A.  Correct.
20   Q.  Okay.  Do you remember undertaking that process
21   or being involved in that process in connection with
22   the fire suppression company?
23   A.  I'm not sure if I understand what you're
24   saying.

SIGNATURE REP TING, INC.

9  (Pages 30 to 33)

Page 38

1  freezing, is that something typically you would have
2  found important or put weight on?
3       A.  Yeah, if it needed to be heated.
4  Q.  Do you know if the second or third floor of the
5  properties were heated?
6       A.  I don't remember.
7  Q.  Do you remember how the first floor was heated?
8       A.  No.
9  Q.  Do you have any recollection of construction
10  materials or other things that might be used in the
11  maintenance of the building being stored anywhere in
12  the building?
13       A.  No, I don't remember.
14  Q.  Did you maintain any like stash or store of
15  construction materials or any tools or anything else
16  like that within the property?
17            MR. KANCHER:  Object to the term stash,
18       but we're of a different age.
19            MR. COLEMAN:  Cache.
20            THE WITNESS:  No, I don't remember.
21  BY MR. COLEMAN:
22  Q.  So you have no recollection of having
23  maintained or stored any materials, construction
24  goods, anything that you would be -- anything that
            SIGNATURE REP TING, INC.

Page 39

1  you might need in connection with the property at
2  the property during your tenure?
3       A.  Not that I remember, no.
4  Q.  Did you do any physical labor yourself during
5  your tenure here at this property?  Were you
6  physically repairing things?
7       A.  No.
8  Q.  If there was a light out --
9       A.  No.
10  Q.  -- or if there was a window broken, that was
11  all contracted out?
12       A.  Correct.
13  Q.  Okay.  I apologize if this is somewhat
14  redundant, was there anyone else at PPM that would
15  have been called out to make replacements or to fix
16  lights, to fix windows, to mop up floors?
17       A.  No.
18  Q.  So is it fair to say the only people that would
19  have done that for this particular building were
20  outside contractors?
21       A.  Yeah.  That's how I remember it, yeah.
22  Q.  So PPM didn't have like a maintenance group or
23  a maintenance person that they would --
24       A.  No.
            SIGNATURE REP TING, INC.

Page 40

1  Q.  -- send to the building and address certain
2  things?  To your knowledge, did PPM or 7th and
3  Allen, did they use the second or third floors at
4  any point?
5       A.  For?
6  Q.  For anything.
7       A.  No.
8  Q.  Do you think they would have known if they were
9  using the second or third floors for any purpose?
10       A.  I will think so, yes.
11  Q.  Why do you think you would have known?
12       A.  Just things would have looked different
13  and I mean it's -- how would I have known, just I
14  guess a visual inspection I would have noticed.
15  Q.  How was the property accessed physically?  Was
16  there a key, were there a set of keys?
17       A.  Keys.
18  Q.  Did you possess those?
19       A.  Yes.
20  Q.  Were those maintained in PPM's office?
21       A.  Yes.
22  Q.  During your tenure there was there anyone else
23  that would also regularly visit the property with
24  you?
            SIGNATURE REP TING, INC.

Page 41

1       A.  No.
2  Q.  Okay.  Do you have any recollection of the
3  third floor has that bank of windows on it?
4       A.  Yeah.
5  Q.  During your tenure as property manager did you
6  have any problems with any of those windows at any
7  point?
8       A.  Not that I recall, no.
9  Q.  Do you recall problems with people accessing
10  the building that weren't supposed to be accessing
11  the building?
12       A.  No, not that I remember now.
13  Q.  During your tenure were there any thefts from
14  the property?
15       A.  Not that I remember.
16  Q.  Any break-ins, anything like that?
17       A.  No.
18  Q.  Again, is that something that if it had
19  happened, you would have been the guy that would
20  have known?
21       A.  Yes.
22  Q.  Was part of your role to be a liaison for the
23  tenants and the property owner?
24       A.  Yes.
            SIGNATURE REP TING, INC.

11  (Pages  38  to  41)

Page 66

1  "6-3-04, replaced three pendant heads and one
2  bushing that were leaking. Replaced missing FDC
3  cap. Recharged system and reset panel. No leaks."
4     Q. Do you have any independent recollection of
5  Kistler O'Brien finding three leaking pendant heads
6  in June of 2004?
7     A. No.
8     Q. If you look to the first page, the exhibit,
9  it's the second entry down, it's 5-11-07.
10    A. Uh-huh.
11    Q. It reads, "Spoke w/Brian Hannon and explained
12  that we are not continuing with inspection."
13    Did I read that correctly?
14    A. Yes.
15    Q. Do you have a recollection of being with
16  someone at Kistler O'Brien about Kistler refusing to
17  continue to perform inspections of this property?
18    A. No.
19    Q. Second sentence in that paragraph reads,
20  "System has been written up and nothing done."
21    Did I read that correctly?
22    A. Yes.
23    Q. Do you have an understanding as to what that
24  means?

SIGNATURE REP TING, INC.

Page 67

1     A. No.
2     Q. Final sentence says, "Multiple leaks, unheated
3  areas, heads over 50 years old, FDC caps missing.
4  Building is a hazard - no lights, holes in the
5  floors."
6     Did I read that correctly?
7     A. Yes.
8     Q. Do you have any recollection of speaking with
9  anyone from Kistler about any of the issues that
10  were identified in that paragraph I just read?
11    A. Not that I remember, no.
12    Q. Fair to say that you're the only Brian Hannon
13  working for PPM at that point?
14    A. Fair to say.
15    Q. Do you have an understanding as to what the
16  phrase "system has been written up" means?
17       MR. KANCHER: I'm going to object to the
18  form.
19       THE WITNESS: Yeah, I don't know what
20  that means.
21  BY MR. COLEMAN:
22    Q. Do you have any recollection of Kistler
23  reporting multiple leaks 5-2007?
24    A. No, not that I remember. No.

SIGNATURE REP TING, INC.

Page 68

1     Q. And it's my understanding you left PPM prior to
2  this particular event, correct?
3     A. To what event?
4     Q. The March 2009 event.
5     A. Correct.
6     Q. Did you ever talk to anyone at PPM about what
7  had happened during that incident?
8     A. No, not really. No.
9     Q. You say not really, did you talk to anybody?
10    A. I spoke to Laura initially and she just
11  told me about what, you know, that something had
12  happened, but that's about all I knew.
13    Q. Initially in and around March 2009?
14    A. No, I think I was later than that.
15    Q. What did she tell you happened?
16    A. She just -- I guess that there was a
17  flood, that's all she knew.
18       MR. COLEMAN: Mark this as Hannon-4
19  please, Miss?
20
21              * * *
22    (Whereupon, Exhibit Hannon-4 was marked
23  for identification.)
24              * * *

SIGNATURE REP TING, INC.

Page 69

1  BY MR. COLEMAN:
2     Q. If you would take a look please, sir, at what
3  we marked as Hannon-4. For the record, it's Kistler
4  0036. Do you have any recollection of having seen
5  this document before today, sir?
6     A. No.
7     Q. And just focus your attention on kind of the
8  middle where it says, "Performance
9  Expectation/Reported Condition."
10    A. Okay.
11    Q. Reads, "Trouble call, alarm panel going off,
12  water pipe broken 4th floor -- something that's
13  indecipherable -- looks like water line must have
14  froze and broken. Building unheated, pipe is coming
15  off of boiler system. Not a sprinkler problem."
16    Do you see where I read that?
17    A. Yeah.
18    Q. Do you have any recollection of that particular
19  incident?
20    A. No.
21    Q. Okay. In this timeframe, February of 2004, you
22  would have been the person that would have addressed
23  something like this though, right?
24    A. Right.

SIGNATURE REP TING, INC.

18 (Pages 66 to 69)

Page 70

1   Q.   And then if you look under work performed, the
2   second two -- the last two lines, it says looks like
3   a star, "Note, building heat must be maintained in
4   unoccupied areas to prevent future problems."
5       Did I read that correctly?
6       A.   Right.
7   Q.   And your testimony is you have no recollection
8   of there being a problem with unheated areas in this
9   building?
10      A.   Right.
11  Q.   Would it have been your typical practice to
12  review reports provided by contractors that were
13  working for you and PPM?
14      A.   Yes.
15          MR. COLEMAN:  If you would mark this as
16  Hannon-5, please?
17
18              * * *
19      (Whereupon, Exhibit Hannon-5 was marked
20  for identification.)
21              * * *
22
23  BY MR. COLEMAN:
24  Q.   Sir, for the record we've marked as Hannon-5
        SIGNATURE REP TING, INC.

Page 71

1   it's a Sprinkler System Inspection Report from
2   Kistler O'Brien dated 11-4-04.  If you could take a
3   second and look at that.  Have you had a second to
4   look at this?
5       A.   Uh-huh.
6   Q.   Do you have a recollection of having seen
7   documents like this from Kistler O'Brien during your
8   tenure as property manager?
9       A.   Documents like this?
10  Q.   Yes.
11      A.   Yes.
12  Q.   Now, is this the inspection report that I think
13  you referenced before, the inspection that was done
14  by Kistler O'Brien?
15      A.   I'm sorry, I'm not sure what you mean by
16  that.
17  Q.   Is this document the report that you had
18  received after Kistler did an inspection of the
19  building?
20      A.   Yes.
21  Q.   Do you have any recollection of seeing this
22  particular document?
23      A.   No.
24  Q.   Okay.  But recollection generally of seeing
        SIGNATURE REP TING, INC.

Page 72

1   documents like this from Kistler?
2       A.   Uh-huh.
3   Q.   Okay.  And this is dated 11-04-04, which
4   overlaps your tenure as property manager?
5       A.   Correct.
6   Q.   And just focus your attention on the first page
7   one, says General and then it's subheading little
8   "I."  You see where I'm looking?
9       A.   Uh-huh.
10  Q.   Says, "In areas protected by wet system, does
11  the building appear to be properly heated in all
12  areas, including blind attics, perimeter areas and
13  are all exterior openings against entrance of cold
14  air?"
15      And do you see there's a mark there to the
16  right?
17      A.   Right.
18  Q.   And that's in the no column?
19      A.   Uh-huh.
20  Q.   And then if you look at the second page under
21  18, says explanation of any no answers.  You see
22  where I'm looking at?
23      A.   Uh-huh.
24  Q.   And I'll represent to you I believe we got this
        SIGNATURE REP TING, INC.

Page 73

1   from a technician who wrote it, but there's a
2   bracket there on the second line, it's 1 little "I"
3   it looks like.  You see where I'm looking at, on the
4   second line of 18?
5       A.   Okay.
6   Q.   And that corresponds to the 1 little "I" that
7   we looked at that identified that the building was
8   not adequately protected on the front, first page.
9   Do you follow me?
10      A.   Okay.
11  Q.   Do you follow me?
12      A.   Uh-huh.
13  Q.   And then after that 1 little "I" on 18, and I
14  know it's hard to read, but it would appear to read,
15  "The unoccupied parts of the building --
16  something -- have heat, pipes could freeze and
17  break."
18      Do you see where I read that?
19      A.   Yeah.
20  Q.   Okay.  Is that generally how you would read
21  that?
22      A.   Yeah.
23  Q.   So this is Kistler O'Brien identifying a
24  problem with the property lacking heat and then
        SIGNATURE REP TING, INC.