Page 74

1  providing an explanation on the report to you as the
2  property manager?
3      MR. KANCHER: I'm going to object to the
4  form.
5      THE WITNESS: Right. But this -- I've
6  never seen this, but yeah.
7  BY MR. COLEMAN:
8  Q. Understood?
9  A. An explanation, sure.
10 Q. And this is the type of document that you
11 recall receiving from Kistler O'Brien during your
12 tenure with PPM?
13 A. Yeah.
14 Q. Okay. Do you know who -- do you know who
15 signed this document?
16 A. No.
17 Q. It looks like it's a Cheryl Smith. Name ring
18 any bells to you?
19 A. No.
20 Q. Is this the type of document that would in the
21 ordinary course of PPM's business practices be
22 received and then put into their file?
23     MR. KANCHER: I'm going to object to the
24 form.
          SIGNATURE REP TING, INC.

Page 75

1      THE WITNESS: Would this be filed?
2      MR. COLEMAN: Yes, sir.
3      THE WITNESS: Yes.
4  BY MR. COLEMAN:
5  Q. In the ordinary course of business?
6  A. Yes.
7  Q. Would the fact that Kistler O'Brien had
8  identified a failure to adequately protect the
9  system from freezing, would that have been an
10 important concern or issue for you to have known
11 about in 2004?
12     MR. KANCHER: Object to the form.
13     THE WITNESS: Would it have been
14 important, well there was never -- we've
15 never had a problem with it before, I guess,
16 from what I remember.
17 BY MR. COLEMAN:
18 Q. Understood. But the question was a little
19 different. If Kistler O'Brien had, in fact,
20 identified a problem with the protection of the
21 system --
22 A. Uh-huh.
23 Q. -- as set forth in this exhibit, would that
24 have been an issue that would have been a concern to
          SIGNATURE REP TING, INC.

Page 76

1  you in 2004?
2      MR. KANCHER: Object to the form.
3      THE WITNESS: Well, it's -- I mean, yes
4  and no. It could, doesn't say it will or
5  anything like that.
6  BY MR. COLEMAN:
7  Q. They're highlighting a potential problem?
8  A. Potential.
9  Q. And in your role as property manager, if an
10 outside contractor had highlighted a potential
11 problem, is that something that you would have found
12 important?
13     MR. ELKIND: Object to the form.
14     MR. COLEMAN: To at least to have been
15 aware of.
16     MR. KANCHER: Object to the form.
17     THE WITNESS: To be aware of, yeah.
18 BY MR. COLEMAN:
19 Q. And it's your testimony that you weren't aware
20 that Kistler O'Brien had highlighted that as a
21 potential problem?
22 A. Right.
23 Q. Any reason why you weren't aware that Kistler
24 O'Brien had apparently highlighted this to you guys
          SIGNATURE REP TING, INC.

Page 77

1  on more than one occasion?
2      MR. ELKIND: Object to the form.
3      MR. KANCHER: Object to form.
4      THE WITNESS: No, I don't remember.
5  BY MR. COLEMAN:
6  Q. And not to beat a dead horse, but when you came
7  on to the property in 2003, if Kistler O'Brien had
8  identified the same concern that the wet sprinkler
9  system was not adequately protected from freezing,
10 would that have been an issue that you would have
11 liked to have known when you took over management of
12 this property?
13     MR. KANCHER: Object to the form.
14     MR. ELKIND: Objection.
15     THE WITNESS: Yes.
16 BY MR. COLEMAN:
17 Q. During your tenure as property manager did you
18 undertake any efforts to protect the second or third
19 floor from freezing, potentially freezing?
20     MR. KANCHER: Object to the form.
21     THE WITNESS: Not that I remember, no.
22 BY MR. COLEMAN:
23 Q. Do you remember anyone from PPM taking any
24 steps to protect the second or third floor of the
          SIGNATURE REP TING, INC.

20 (Pages 74 to 77)

Magna Legal Services

Page 82

1  says, "Replace/repair windows."
2    A. Okay.
3    Q. "Windows are basically shot and holding them
4  closed by bracing with wood is not OK and not
5  working."
6       Do you see where I read that?
7    A. Uh-huh.
8    Q. Did I read it correctly?
9    A. Yes.
10   Q. Do you know what windows that entry is
11 referencing?
12   A. No.
13   Q. Okay. During your tenure as property manager
14 did you do anything to address the state or
15 condition of the windows in the third floor of the
16 property?
17   A. No.
18   Q. Okay. You can set that aside. Thank you.
19 During your tenure was George in the office a lot?
20   A. I don't remember. I don't -- no.
21   Q. He wasn't?
22   A. No, I don't remember if he was or if he
23 wasn't.
24   Q. Okay. How would you describe George as a
SIGNATURE REP TING, INC.

Page 83

1  manager, as a property owner?
2       MR. KANCHER: I'm going to object to the
3    form.
4       THE WITNESS: Good.
5  BY MR. COLEMAN:
6    Q. And how come?
7    A. He knew his stuff.
8    Q. Was he a hands-on type of guy?
9    A. As far as physically, no.
10   Q. Was he actively engaged with the reports and
11 the conditions of the property?
12   A. I'd have to say yes.
13   Q. Were you aware during your tenure as to how the
14 different areas of the building were heated?
15   A. No.
16   Q. So you didn't have an understanding of the
17 HVAC, how the systems were aligned?
18   A. No.
19   Q. And what heated what?
20   A. I don't remember.
21   Q. You don't remember?
22   A. No.
23      MR. COLEMAN: I don't think I have anymore
24   questions for you. Thank you very much.
SIGNATURE REP TING, INC.

Page 84

1       MR. KANCHER: You want to take a break?
2    I'll have some questions.
3
4               * * *
5       (Whereupon, a brief recess was taken.)
6               * * *
7
8  BY MR. KANCHER:
9    Q. Mr. Hannon, my name is Kancher. I represent
10 7th and Allen, the plaintiff in this matter. I have
11 a few questions to ask you by way of follow-up. I
12 think you said that during your management of this
13 building, the three or four years that you managed
14 it, you would visit it every month, every other
15 month around the year, year round, is that correct?
16   A. Right.
17   Q. If there were broken windows that you saw, what
18 would you do?
19   A. Repair them or get them repaired.
20   Q. Well, we understand you didn't --
21   A. Right.
22   Q. You weren't the glazier, but you would have
23 them repaired?
24   A. Sure.
SIGNATURE REP TING, INC.

Page 85

1    Q. Would that be then that was the case through
2  the time that you were managing the building?
3    A. Yes.
4    Q. When you first went through the building was
5  there any furniture or furnishings of any kind on
6  the second and third floors that you saw, that you
7  remember?
8    A. There was some, just basically some tables
9  and things like that.
10   Q. Were there any desks or chairs there, do you
11 recall?
12   A. Yeah, some.
13   Q. And is my recollection of your testimony
14 correct that through the time that you were managing
15 the building, those four or five years, there were
16 attempts to lease the space on the second and third
17 floor to third parties?
18   A. Correct.
19   Q. That is right?
20   A. Correct.
21   Q. Although it was never actually leased?
22   A. Right.
23   Q. Do you know who was involved in the attempts to
24 leasing it on the part of the building?
SIGNATURE REP TING, INC.

Page 86

1  A. I don't. I don't remember.
2  Q. Were you involved, do you know? Do you recall?
3  A. Somewhat, yeah. I showed -- I was the on
4  site person.
5  Q. Did you do any negotiations for the lease?
6  A. No.
7  Q. Do you know if Mr. Diemer did?
8  A. I would imagine so, yes.
9  Q. Did he show anybody the space in the building
10 that you're aware of? When I say the space, the
11 second and third floor?
12 A. I don't remember.
13 Q. Okay. To your recollection during the four or
14 five years that you managed the building, certainly
15 we're talking about the wintertime, I guess?
16 A. Uh-huh.
17 Q. Were there any problems with the sprinkler, the
18 fire suppression sprinkler system freezing?
19 A. No, not that I remember. No.
20 Q. Would you go on to the second and third floors
21 during the winter in these monthly or bi-monthly
22 inspections?
23 A. Yes.
24 Q. What were the heating conditions or the heat
SIGNATURE REP TING, INC.

Page 87

1  conditions or the warmth conditions or the cold
2  conditions on the second and third floors during
3  those winters?
4  A. Sufficient.
5  Q. How do you mean sufficient?
6  A. Above, they weren't -- it wasn't freezing
7  in there.
8  Q. I take it it wasn't hot either?
9  A. No. No, but it wasn't freezing.
10 Q. You were asked to look at a report from -- it
11 actually predates your time with PPM, Hannon-1,
12 Peerless Insurance, and it talks about 02-10-02 and
13 I understand this was sent to Connie White. You
14 weren't an employee of PPM when it was sent and I
15 think you said you never saw it, but you were asked
16 some questions about that entry and it talked about
17 the temperature on the second or third floors.
18    At any time that you were managing the building
19 was there ever a lack of appropriate heat on the
20 second and third floors?
21    MR. COLEMAN: Object.
22    THE WITNESS: I mean, not that I remember.
23 BY MR. KANCHER:
24 Q. When you were managing the building were
SIGNATURE REP TING, INC.

Page 88

1  there -- was there lighting on the second and third
2  floors that you recall?
3  A. Yeah, I think so.
4  Q. Do you recall holes in the floor?
5  A. No.
6  Q. Holes in the decking of the floor?
7  A. No, not that I remember.
8  Q. When you would visit the building during the
9  winters, did you go into the -- I think it was an
10 Eckerd drugstore at the time? Did you go into the
11 Eckerd drugstore?
12 A. Yes.
13 Q. Did you go into it -- had it changed to a Rite
14 Aid store at any time that you were managing the
15 building?
16 A. I don't remember. I don't think so. I
17 think it was always an Eckerd.
18 Q. Was the store comfortably heated during those
19 winters that you went in?
20 A. Yes.
21 Q. Do you know who -- I want to look at Hannon-5.
22 Hannon-5 is the -- what Kistler O'Brien says was an
23 inspection report of November of 2004.
24 A. Okay.
SIGNATURE REP TING, INC.

Page 89

1  Q. And I believe -- I believe you said you hadn't
2  seen this document before today?
3  A. Correct.
4  Q. Do you know who Cheryl Smith is?
5  A. I do not.
6  Q. To your knowledge or your recollection, was
7  Cheryl Smith ever an employee of Professional
8  Property Management?
9  A. No.
10 Q. Do you know if she was ever an employee of 7th
11 and Allen, LLC directly?
12 A. No. I never heard, no.
13 Q. You were asked a question on Mr. Coleman's
14 examination that you didn't take steps to protect
15 the second and third floor from freezing. What was
16 the reason you didn't take any steps?
17 A. I guess no steps were needed.
18 Q. How do you mean?
19 A. The temperatures weren't below freezing.
20 Q. Did you ever feel there was a danger of the
21 fire suppression system on the third floor freezing
22 because of -- well, because of temperatures that
23 would induce freezing in water?
24 A. Not that I remember.
SIGNATURE REP TING, INC.

23 (Pages 86 to 89)

Page 90

1  Q. As the building manager in those five years
2  were you satisfied that the fire suppression system
3  was safe from freezing during the winter because of
4  the heating conditions in the building?
5      A. From what I remember, yes.
6         MR. KANCHER: Thank you.
7         MR. COLEMAN: Just a couple quick
8  follow-ups.
9  BY MR. COLEMAN:
10 Q. We looked at Hannon-5?
11     A. Uh-huh.
12 Q. And you said you didn't know who signed it, but
13 is the address on the top of the front first page,
14 the Professional Property Management, 3000 Atrium
15 Way, Suite looks like 219, Mount Laurel, is that the
16 address for PPM?
17     A. Yes.
18 Q. You said during Mr. Kancher's examination that
19 you felt that the heat was, quote, "Sufficient on
20 second and third floors to protect the system from
21 freezing."
22    Did you ever take any measurements of what the
23 temperatures were on any of your visits?
24     A. No.

SIGNATURE REP TING, INC.

Page 91

1  Q. I think you also said that you were satisfied
2  during your tenure that the system wouldn't freeze.
3  But you don't have a recollection of the fire
4  suppression company telling you that it was not
5  protected from freezing?
6      A. Right, it was never.
7  Q. If, in fact, you had learned that the fire
8  suppression company had told you that they weren't
9  satisfied that it was protected from freezing, --
10     A. Uh-huh.
11 Q. -- would that have impacted your -- would that
12 have made a difference to you?
13        MR. KANCHER: I object to the form.
14        MR. ELKIND: I object to form. Doesn't
15 make any sense.
16        MR. COLEMAN: Could you read that back,
17 then I'll rephrase it?
18
19        * * *
20    (Whereupon, the court reporter read back
21 the pending question.)
22        * * *
23
24        MR. KANCHER: And I object to the form.

SIGNATURE REP TING, INC.

Page 92

1         MR. COLEMAN: Do you understand the
2  question?
3         THE WITNESS: I don't understand -- I
4  understand what you're saying.
5  BY MR. COLEMAN:
6  Q. You said you felt -- my understanding of your
7  testimony was that you were satisfied that it was
8  protected from freezing, correct?
9      A. Yeah. I mean, it didn't seem overly cold
10 to me.
11 Q. And my question was then if you had learned
12 that the fire suppression company that inspected
13 it --
14     A. Uh-huh.
15 Q. -- had not been satisfied that it was protected
16 from freezing, would that have changed your opinion
17 that it was sufficiently protected from freezing?
18        MR. KANCHER: Object to the form.
19        THE WITNESS: No.
20 BY MR. COLEMAN:
21 Q. Why not?
22     A. Just because I didn't know that we were --
23 there was a problem with the second or third floor.
24 There was never any problem to me as far as

SIGNATURE REP TING, INC.

Page 93

1  temperatures.
2  Q. But you never tested the temperatures yourself?
3      A. No, I didn't.
4         MR. COLEMAN: No more questions. Thank
5  you very much.
6         MR. KANCHER: Thank you.
7
8     (This deposition concluded at 2:00
9  p.m.)

SIGNATURE REP TING, INC.

24 (Pages 90 to 93)

Magna Legal Services

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 7th & ALLEN EQUITIES, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HARTFORD CASUALTY INSURANCE )<br>COMPANY, )<br>)<br>Defendant. ) | CIVIL ACTION<br><br>NO. 5:11-cv-01567 (JKG) |

## CERTIFICATE OF SERVICE

The undersigned hereby certify that on October 9, 2012, the foregoing, *Plaintiff's Response In Opposition To Defendant's Motion In Limine To Exclude Expert Testimony Of Gary Sheesley, P.E. and Memorandum of Law in support thereof,* was filed electronically via the Court's Electronic Case Filing (ECF) System and is available for viewing and downloading. The following parties are listed as ECF Filing Users and are therefore automatically served via electronic means:

Thomas S. Coleman, Esquire
Richard D. Gable , Jr., Esquire
**BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP**
1818 Market Street, Suite 2740
Philadelphia, PA 19103
Email: tcoleman@butlerpappas.com
Email: rgable@butlerpappas.com

*Attorneys for Defendant*

O. Daniel Ansa, Esquire
Michael J. O'Neill, Esquire
**ANSA ASSUNCAO LLP**
Four Penn Center, Suite 900
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
Email: daniel.ansa@ansalaw.com
Email: michael.oneill@ansalaw.com

*Attorneys for Defendant*

                        **SILVERANG & DONOHOE, LLC**

By: _/s/ Mark S. Haltzman_____

Mark S. Haltzman, Esquire
Attorney I.D. No: 38957
mhaltzman@sanddlawyers.com
595 East Lancaster Avenue, Suite 203
St. Davids, PA 19087

Mark S. Kancher, Esquire
**THE KANCHER LAW FIRM LLC**
Attorney I.D. No: MK4461
mkancher@kancherlawfirm.com
Grove Professional Center
100 Grove Street
Haddonfield, NJ 08033
(856) 795-2440

*Attorneys for Plaintiff*